In re AFCO ENTERPRISES, INC., Debtor.

In re AFCO DEVELOPMENT CORPORATION, Debtor.

In re AFCO INVESTMENT CORPORATION, Debtor.

In re AFCO LEASING CORPORATION, Debtor.

Bankruptcy Nos. 82C–00577 to 82C–00579, 82C–01411.

United States Bankruptcy Court, D. Utah.

Nov. 16, 1983.

Randy L. Dryer and Lawrence E. Stevens of Parsons, Behle & Latimer, Salt Lake City, Utah, for the trustee.

Edward M. Garrett and Thomas C. Sturdy of Garrett & Sturdy, Salt Lake City, Utah, for Deseret Federal Sav. and Loan Ass'n.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

The trustee in the above-entitled cases requests an award of his costs and expenses incurred in connection with the largest asset of the consolidated estates, a resort complex located in Cache County, Utah known as Sherwood Hills. The trustee seeks payment from the first lienholder on the property, Deseret Federal Savings & Loan, (Deseret Federal) which has previously been permitted to foreclose its lien and sell the property. The trustee relies upon 11 U.S.C. § 506(c) as the statutory authority for his request. Section 506(c) states:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Debtors filed Chapter 11 petitions on March 18, 1982. On March 31, 1982, Deseret Federal joined the motion of two other creditors seeking the appointment of a trustee. On April 20, 1982, the court appointed Frank K. Stuart as trustee. He immediately assumed the management of the debtors' estates, including the Sherwood Hills resort. Because there were virtually no liquid assets in the estates, the trustee and Deseret Federal negotiated an agreement whereby Deseret Federal would advance additional funds to the trustee to cover the operating deficits of Sherwood Hills. Deseret Federal was granted a superpriority lien for any such funds expended as provided by § 364(d)(1).

The trustee operated the resort until February 10, 1983, when Deseret Federal, after having obtained relief from the automatic stay, exercised its power of sale under the trust deed and sold the property to itself.

During the trustee's ten month administration of Sherwood Hills, he maintained the resort as an ongoing business. The trustee, his accountants, attorneys, and other agents performed the following activities: operating, repairing and managing the facility, advertising and marketing the property for sale, preparing budgets and financial forecasts, evaluating contracts and leases affecting the property, and negotiating with Deseret Federal and other creditors. Costs and expenses requested by the trustee total $240,736.35. There are no assets in the estate with which to pay administrative expenses.

At the time of the filing of debtors' petitions, the debtors owed Deseret Federal $4,156,847.00. Since the filing, contractual interest has accrued in the amount of $1,364,652.00. In addition, Deseret Federal advanced $140,763.00 to cover operating deficits. There were also numerous junior liens, tax liens and other encumbrances. Deseret Federal's hired appraisal of the value of the property on April 22, 1982 was $5,000,000.00. The parties stipulated that the same appraiser would testify that the fair market value of the property in February of 1983 was $4,125,000.00.[1]

---

1. There was no explanation, during the course of the hearing, concerning the reasons for this

Deseret Federal contends that because the net equity in the property has decreased, the trustee is not entitled to an award of costs and expenses. As support for this argument, Deseret Federal cites the House and Senate Reports which state:

> [506(c)] codifies current law by permitting the trustee to recover from property whose value is greater than the sum of the claims secured by a lien on that property that reasonable, necessary costs and expenses of preserving, or disposing of, the property. The recovery is limited to the extent of any benefit to the holder of such claim.

House Report No. 95–595, 95th Cong., 1st Sess. 357 (1977); Senate Report No. 95–989, 95th Cong., 2d Session 68 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854, 6313.

This statement appears to lend support to Deseret Federal's position that the trustee can recover only where the value of the property exceeds the total amount of the encumbrances against the property. However, other legislative statements indicate a contrary conclusion.

> Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving ... a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.

124 Cong.Rec. H 11,095 (Sept. 28, 1978); 124 Cong.Rec. S 17,411 (Oct. 6, 1978).

■ Further, the language of the statute imposes no requirement of equity in the secured property. By contrast, § 506(b) specifically limits recovery of contractual costs and expenses to the "extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim." Congress' omission of similarly restrictive language in § 506(c) strongly suggests that the relationship between the value of the property and the amount of secured claims is not a controlling consideration in awarding the trustee's costs and expenses.[2] When legislative statements contradict statutory language, the express terms of the statute must prevail. The court concludes that the relative values of the collateral and the secured claims are not determinative in deciding the applicability of § 506(c). Accord, *In re Trim-X, Inc.,* 695 F.2d 296 (7th Cir.1982).

■ Having determined that § 506(c) may apply where there is no equity in the property, the court must analyze the three requirements set forth in the statute. First, the costs and expenses must have been reasonable and necessary; second, the costs and expenses must have been incurred for the purposes of preserving or disposing of the secured property; and third, any recovery for costs and expenses is limited to the extent of the benefit to the holder of the secured claim.

Legislative history states that § 506(c) "codifies current law."[3] However, the case law concerning assessment of costs and expenses of administration to secured creditors has been less than clear. As stated by one commentator:

> [H]ardly any phase of the bankruptcy law has been plagued with so many inconsistent generalities; irreconcilable rules and principles, disagreements between circuits and even within circuits (apparently without any awareness thereof) and loose, indiscriminate statement of rules and citations of authority.[4]

---

decline in value. There is no evidence that the diminution in value was a result of the trustee's administration and management of the resort.

**2.** The absence of equity in the collateral may be a factor to consider, even though it is not specifically included in the statutory scheme of § 506(c). However, where there is equity, it may be an indication that the trustee's actions

are for the benefit of unsecured creditors rather than the holder of the secured claim.

**3.** House Report No. 95–595, 95th Cong., 1st Sess. 357 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 68 (1978).

**4.** 4A COLLIER ON BANKRUPTCY ¶ 70.99[6], at 1224–25 (14th ed. 1975).

The courts have relied upon various theories in determining whether to assess costs and expenses. One theory looks to the proceeds from the sale of secured property. If the proceeds are in excess of the amount of secured indebtedness, the surplus is first applied to pay the trustee's costs and expenses. This approach recognizes that if the trustee elects to sell the collateral to obtain the equity for general creditors, then the general creditors receive the benefit of the trustee's efforts and they should bear the trustee's costs and expenses. The trustee runs the risk, by choosing to sell secured property rather than abandon it, that the purchase price may not exceed the amount of the secured debt. In such a case, the trustee's costs and expenses incurred in disposing of the property would not be paid.

Some courts have applied a "state foreclosure theory" which is based upon the premise that a secured creditor is an unwilling participant in the bankruptcy proceeding. When the trustee sells secured property, the only benefit to the secured creditor is the amount he would have expended in a state court forum pursuing a foreclosure action. Accordingly, the courts limit the recovery from the secured creditor to the actual costs of foreclosing the property.

The consent of the secured creditor has been viewed by many courts as the controlling factor in assessing costs and expenses. Under the consent theory, a secured creditor may be liable for costs of sale, preservation and protection of the collateral, and administrative expenses. The rationale of the theory is that if the creditor willingly seeks the aid of the bankruptcy court, he has agreed to the payment of costs and expenses thereby incurred.

The final theory relied upon by the courts is based upon the benefit realized by the secured creditor as a result of the bankruptcy proceeding. While, as a general rule, secured creditors should not be charged with the expenses of administration, the courts have carved out an exception based upon the equitable doctrine of unjust enrichment. When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.[5]

Congress determined that the trustee's recovery should be based upon the benefit to the secured creditor, incorporating this language into § 506(c). This factor, benefit to the holder of the secured claim, is the linchpin in an award under § 506(c).

A trustee may expend time, money and effort to preserve or dispose of secured property and thereby incur costs and expenses which are reasonable and necessary, but unless there is some demonstrated benefit to the creditor, the trustee will recover nothing.

■ Deseret Federal argues that because the property's fair market value decreased while the secured indebtedness increased, there was no benefit to Deseret Federal. The trustee, on the other hand, contends that the benefit to Deseret Federal was the preservation of the property's value as a going concern and the resulting opportunity to sell it as a going concern.

The court rejects Deseret Federal's interpretation of benefit; it is too narrow. The definition of benefit encompasses more than the bottom line of a balance sheet. Preservation of the going concern value of a business can constitute a benefit to the secured creditor. *In re World of English, N.V.,* 21 B.R. 524 (Bkrtcy.N.D.Ga.1982); *In re Jim Kelly Ford of Dundee, Ltd.,* 14 B.R. 812 (Bkrtcy.N.D.Ill.1980).

The evidence presented at the hearing showed that the trustee's operation of the resort did preserve the collateral's going concern value and that Deseret Federal benefited as a result. Based upon the testimony of the trustee's expert witness, the court finds that if the resort had been closed, its value would have decreased.

**5.** For an in depth discussion of these theories and the supporting case law, *see* Note, "The Cost of Realization by a Secured Creditor in Bankruptcy," 28 VAND.L.Rev. 1091 (1975).

The expert witness considered various factors in reaching his conclusion that operating the resort preserved the property. The testimony showed that if the resort had been closed, it would have been difficult to maintain the good will of customers, suppliers, and the community in general. Sherwood Hills is located in a sparsely settled rural area and there are few suppliers of goods and services. Bad relations with suppliers and employees could have alienated the community. A resort like Sherwood Hills needs community support to attract and maintain clientele, as well as to maintain credibility with agencies of local government such as planning and zoning commissions and water districts. Also, the business might have lost its water rights through abandonment.

As a result of a shut down, time share owners would have refused to make contract payments or maintenance fee assessments. By operating the resort as a going concern, the trustee maintained Sherwood Hill's reputation as a time share facility and preserved the option of selling the resort with the time share contracts intact. In addition, this resort must be self-promoting because it has no natural features to draw people to the area. Had the resort closed for any sustained period of time, the cost of reviving public awareness would have been significant. The trustee also prevented further erosion of the property's fair market value through repairs and improvements of the property which protected the physical assets of the business.

The preservation of the property and its going concern value benefited Deseret Federal in two ways. First, by keeping the good will of the business intact, the value of the collateral is greater than it otherwise would have been. Even though the fair market value of the property declined during the trustee's administration, without the trustee's efforts, the value would have been even less. Mr. Stuart, the trustee, testified that if the resort had been closed, the property's value would have depreciated fifteen per cent as a result of the loss of going concern value. The stipulated value of the property as a going concern was $4,125,000.00 in February 1983. If the resort had been closed, the decrease in value would have been an additional $618,750.00.

Second, by continuing to operate and maintain the resort, the trustee preserved options for any subsequent owner of the property such as continuing time share sales, converting the property to a destination resort and eliminating the time share interests, developing additional acreage, or even closing the facility. If the resort had been closed, a new owner would have had to reestablish trade accounts, organize new management, rejuvinate public awareness, and pay for maintenance, improvements and other start-up requirements. These difficulties translate into added expense for a new owner and would be reflected in a lower purchase price. Because the trustee eliminated these difficulties and preserved various options for a potential purchaser, a future purchase price will be greater than it otherwise would have been. To this extent, Deseret Federal was benefited.

It is difficult to measure in dollars and cents the extent of the benefit to Deseret Federal. The trustee seeks a total recovery of $240,736.35. This amount is comprised of $7,873.10 in trustee's fees, $37,542.50 in accountant's fees, $32,880.44 in attorney's fees, and $162,440.31 incurred as an operating deficit.

The trustee attempted to show the extent of Deseret Federal's benefit by introducing evidence of costs and expenses that would have been incurred if the trustee had merely protected the physical assets rather than operating the business. The trustee's expert witness testified that if the trustee had closed and secured the resort, he would have incurred costs and expenses in the amount of $169,835.69. This figure included nonrecurring costs necessary to close the property, such as covering ground floor windows and winterizing the plumbing and fire sprinkler system. It also included monthly costs for utilities, a part-time maintenance person, full-time security and fire insurance, for a nine month period.

Deseret Federal agreed that closing and securing the resort would have preserved the property and the costs incurred in accomplishing this would have benefited Deseret Federal. However, Deseret Federal challenged the $169,835.69 figure through testimony of its own expert witness. He asserted that the monthly utility costs would be considerably less than the amounts presented by the trustee and also questioned the necessity of paying utility deposits.

After considering the conflicting evidence, the court concludes that the trustee's evidence is convincing. The trustee's expert witness' opinion was based upon on-site inspections of the property, research regarding insurance requirements, and actual bids and quotes for the necessary services. The court finds $169,835.69 to be the most accurate estimate of closing costs.

If the trustee had closed the resort, the physical aspects of the property would have been preserved, but the going concern value of the business would have been lost. While it would have cost $169,835.69 to simply protect the property, by operating the resort the trustee not only preserved the property, but repaired and improved it. In addition, he preserved the going concern value. All of this was accomplished at a cost of $240,736.35.

The trustee's witness further testified that the loss in value, if the resort had not been operated, would have been in excess of $240,736.35 and that Deseret Federal was benefited in at least that amount. The trustee testified that the loss in value would have amounted to approximately $618,-750.00. Based upon all of this testimony, the court finds that Deseret Federal was benefited to the extent of at least $240,-736.35. Whether or not Deseret Federal was able to realize the going concern value, the opportunity to do so was valuable to it.

The costs and expenses incurred by the trustee were for the preservation of the property and Deseret Federal received a benefit in excess of these expenditures. The question remaining is whether the costs

and expenses were reasonable and necessary.

The standard governing review of a trustee's actions is explained in *In re Curlew Valley Associates,* 14 B.R. 506 (Bkrtcy.D. Utah 1981). Absent fraud or mismanagement on the part of the trustee, the court will not attempt to second guess the trustee's business judgment made in good faith, upon a reasonable basis and within the scope of the trustee's authority. Deseret Federal does not suggest fraud, mismanagement, bad faith, lack of a reasonable basis, or ultra vires conduct.

Deseret Federal, however, does assert that the trustee should have abandoned the property, or closed and secured the resort; that if the trustee had done this, many of his expenditures would have been unnecessary.

This argument is not persuasive in light of Deseret Federal's motion for the appointment of a trustee and cooperation with the trustee in operating the resort, even to the extent of loaning additional funds to cover operating deficits. Deseret Federal was aware that the appointment of a trustee would increase the costs and expenses of administration and that there were virtually no assets that would be available to pay such costs. While a motion to appoint a trustee does not amount to a guarantee of payment of administrative expenses, Deseret Federal cannot place the financial burden of protecting its collateral on others.

Further, Mr. Emerson Hardy, president of Deseret Federal, acknowledged that Deseret Federal believed the resort to have a higher fair market value if it were open rather than closed; that the trustee had done a competent job of managing the facility; and that Deseret Federal would not have done anything materially different had it been operating the resort. Deseret Federal worked closely with the trustee, cooperating in his efforts to operate the resort and find a buyer for the property.

Deseret Federal's present evaluation of necessary expenditures, arrived at with the benefit of hindsight, cannot override the trustee's judgment exercised at the time of

**518**

the expenditures. Under the *Curlew Valley* standard, the court concludes that the costs and expenses incurred by the trustee were reasonable and necessary for the preservation of the secured property.

The trustee is entitled to recover from Deseret Federal his costs and expenses as claimed, with the exception of the $138,-322.00 superpriority loan. This amount is a portion of the $162,440.31 operating deficit and was advanced by Deseret Federal. The loan was secured by a superpriority position on the subject property. When the property was sold at the trustee's sale on February 10, 1983, the first available proceeds were used to repay $138,322.00 to Deseret Federal. Accordingly, the trustee's costs are reduced in a like amount.

The trustee is awarded and may recover from Deseret Federal $7,873.10 in trustee's fees, $37,542.50 in accountant's fees, $32,-880.44 in attorney's fees, and $24,118.31 to cover the remaining operating deficits, for a total recovery of $102,414.35.