**In re Franklin G. TRENGE, d/b/a Farmington Real Estate and Sylvia L. Trenge, d/b/a Morningside Development Corp.**

Civ. No. 91–834.

United States District Court,
E.D. Pennsylvania.

May 29, 1991.

Lee Sapira, J. Payne, Wyomissing, for appellant.

S. Halperin, for appellee.

## ORDER

LOUIS H. POLLAK, District Judge.

This matter comes before me on the objections of Meridian Leasing, Inc. to an order of Bankruptcy Judge Thomas Twardowski.

### I. FACTS

Sylvia and Franklin Trenge, debtors-in-possession, ("debtors") filed their voluntary Chapter 11 bankruptcy petition on September 27, 1990. The Trenges are in the business of real estate sales and development. On November 29, 1990, the debtors entered into a stipulation with Valley Federal Savings and Loan Association ("Valley Federal") that provided, inter alia, for the distribution of funds to debtors' counsel, debtors' accountants and the debtors from the proceeds generated by the sale of certain realty belonging to the debtors.[1] The realty is encumbered by a variety of creditors including Valley Federal—who holds the senior creditor position with respect to the realty—and appellant Meridian Leasing, Inc., who holds the second position. Appellant's Brief, at 4. Meridian Leasing objected to the stipulation but, after a hearing held on December 4, 1990 and a review of Meridian Bank's objections, Bankruptcy Judge Thomas Twardowski approved the stipulation in a brief order on December 20. Record on Appeal, at 32.

The stipulation, effective for 180 days, provides that, from the sale of any lot in Phase V, the debtors may segregate from the proceeds funds to be used for three purposes:

1. Two thousand dollars per lot, but not to exceed $20,000 total, to create a fund for payment of the debtors' attorney fees, Stipulation, at ¶ 3(a);

2. Two thousand dollars per lot, but not to exceed $10,000 total, to create a fund for the payment of accountant fees, Stipulation, at ¶ 3(a); and

3. One thousand dollars multiplied by the number of weeks since the most recent sale of another lot, to establish a "living expense fund" for the debtors,[2] Stipulation, at ¶ 3(b).

Segregation of the funds is sought under authority of § 506(c) of the Bankruptcy Code, 11 U.S.C., which provides

(c) the trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such a claim.

Appellant objects that the funds which are to be set aside do not satisfy the requirements of § 506(c).

### II. DISCUSSION

#### A. *Standard of Review*

A district court reviewing the decision of a bankruptcy court exercises the same authority as that of a court of appeals reviewing a district court sitting as fact finder. Findings of fact may not be overturned unless clearly erroneous. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981). To the extent the parties challenge applications of law or a bankruptcy court's finding on a mixed question of law and fact, review is plenary. *Id.*

#### B. *The effect of the stipulation*

In seeking to sustain the bankruptcy court's decision, the debtors first contend that "the consent of the secured creditor is a controlling factor in determining whether recovery under 11 U.S.C. Section 506(c) is appropriate." Appellees' brief, at 7. Effectively, the debtors suggest that a junior creditor such as Meridian Leasing

---

**1.** The realty in question is in Lehigh County in a development known as "Springhouse West" and includes twenty-one lots that form Phase V of the development. Letter Brief of Debtors' Counsel, Record on Appeal, at 39.

**2.** Due to the 180 day period of the agreement, the maximum amount recoverable under this portion of the agreement would appear to be $25,000.

lacks standing to object to an agreement between the debtors and a second creditor where funds are to be carved out from property in which the second creditor holds the senior secured interest. See appellees' brief, at 3.

Appellees provide a host of cases that establish the proposition that the consent of a secured creditor is controlling with respect to whether a trustee may recover § 506(c) expenses. In those cases, however, the proposition is either mentioned as dicta, or the case did not include an objection advanced by a junior, but nonetheless secured, creditor.

In a situation such as this, where there is a junior secured creditor objecting to the allowance of § 506(c) expenses, it would be inappropriate to accord presumptive weight to the senior creditor's agreement. This is because any reduction in the value of the secured property—as is effectively accomplished by segregating certain of the secured property for the payment of administrative expenses—works first to the detriment of the junior-most creditor. Such a junior creditor risks seeing property that originally is of sufficient value to compensate both the senior and junior creditor diminished through the payment of § 506(c) expenses. In turn, such a diminution in value threatens to leave a junior secured creditor unsecured with respect to all, or part, of his claim. See 3 *Collier on Bankruptcy,* ¶ 506(c).06 n. 21, at 506(c)–67 (15th ed.1991). Thus, a senior secured creditor's acquiescence in the payment of § 506(c) expenses provides no guarantee that such expenses are in the interests of the junior secured creditor. In turn, it would be inappropriate to give such acquiescence controlling force in the face of objections from such a junior creditor.[3]

### C. *The § 506(c) standard*

Trustee administrative expenses are not usually chargeable to secured creditors since a trustee in bankruptcy acts " 'on the authority of the court and for the interest of the general creditors.' " *In re Trim–X, Inc.,* 695 F.2d 296, 301 (7th Cir. 1982) (quoting *Robinson v. Dickey,* 36 F.2d 147 (3d Cir.1929)). However, § 506(c) recognizes an exception in those instances where expenses are incurred primarily to benefit a secured creditor. *Trim–X,* 695 F.2d at 301. A trustee (or in this case the debtors-in-possession) seeking to invoke § 506(c) must establish three conditions if its claim is to be allowed: the expense must be (1) reasonable, (2) necessary, and (3) beneficial to the secured creditor. Moreover, any recovery of costs is limited to the extent of the benefit conferred on the secured creditor. The party seeking recovery has the burden of demonstrating the existence and amount of the benefit. *Brookfield Prod. Credit Ass'n v. Borron,* 738 F.2d 951, 952 (8th Cir.1984).

**3.** This discussion assumes that, although the expenses are allowed to be compensated out of the secured property, the senior creditor's claim against the property is not reduced in like amount. If, on the other hand, the senior creditor agrees to reduce its claim secured by the property, then there is no detriment to the junior creditor. Essentially, under this second arrangement, the senior creditor would be agreeing to pay the § 506(c) expenses.

In the case presently on appeal, the stipulation provides that the funds to pay the § 506(c) expenses will be segregated from the proceeds resulting from sale of the lots. There is no indication in the stipulation that Valley Federal has agreed to reduce, by amounts equal to the § 506(c) expenses, its claims secured by the lots.

I note, however, that the debtors frame the question on appeal as whether § 506(c) expenses may be compensated when a senior secured creditor agrees to have such expenses taken "from its [the senior creditor's] share of any sale proceeds." Appellees' brief, at 3; see also, appellees' brief, at 17 (stating that "it is Valley Federal's funds that will be used to pay these fees"). This suggests that the parties may have understood the stipulation to provide that Valley Federal would reduce its claim secured by the property by an amount equal to the allowed § 506(c) expenses. In such a case, it would be appropriate to approve the stipulation, as the stipulation would not affect the value of a junior creditor's secured interest.

However, as the stipulation itself contains no provision by which Valley Federal agrees to reduce its claim against the secured property— nor was there any representation to the bankruptcy court at the hearing that this would be the effect of the stipulation—I will proceed on the basis that Valley Federal has not agreed to reduce its claim by amounts equal to the proposed § 506(c) expenses.

The evidence which the bankruptcy court apparently [4] believed established that these conditions were satisfied was the testimony of Franklin Trenge, offered at the December 4 hearing. I consider the testimony with respect to each type of expense for which § 506(c) approval is sought.

### 1. Accountant Fees

Mr. Trenge's entire testimony related to the accountant fees was limited to the following:

Q: Are you able to prepare, right now, a clear summary of your tax obligation?

A: No.

Q: Why can't you do that right now?

\* \* \* \* \* \*

A: We're unable to pay our accountant.

Q: And you directed your counsel to file an application to appoint an accountant?

A: Yes

Q: What funds are you using to live off of right now?

A: We're just, we have a small savings that we are using.

Q: Do you have any funds available right now to pay an accountant?

A: No

\* \* \* \* \* \*

Q: Is there any other place that you can get the funds to pay your attorneys and accountants, absent this agreement with Valley Federal?

A: No

Transcript of Hearing (hereinafter "transcript"), December 4, 1990, at 15–16.

Meridian Leasing objects that such testimony fails to establish any of the elements required under § 506(c). Appellant's brief, at 13–14. Such a claim overreaches. Mr. Trenge's testimony does tend to establish that the payment of accountant fees is a predicate to clarifying the debtors' tax situation. That clarification, in turn, is likely to be an essential element of a successful reorganization of debtors' affairs, i.e. it is a necessary expense. However, with respect to the remaining elements of § 506(c), Meridian Leasing is correct.

I consider first the issue of reasonableness. Appellees suggest in their brief on appeal that "the reasonableness of an expense should be determined based on a comparison of the expense in question to those expenses which the secured creditor would have incurred in foreclosing on the property on its own behalf." Appellees' brief, at 10. Such an assertion has two difficulties. First, accepting that this is the proper standard by which to establish reasonableness, the testimony of Mr. Trenge failed completely to address this question. There was no testimony offered on the expenses—for accounting or any other service—that the secured creditors could have expected to incur in foreclosing on the Phase V property.

■ Second, appellees' proposed standard for evaluating whether an expense is reasonable is more appropriately employed when examining whether the secured creditor will be benefitted by a proposed expense. That is, comparing the costs a secured creditor would incur if forced to foreclose with the costs incurred by the trustee in maintaining and disposing of the property is an inquiry that will yield a quantification of the benefit, or detriment, that the bankruptcy process produced for the secured creditor. *Cf. In re Afco Enterprises, Inc.*, 35 B.R. 512 (Bankr.D.Utah 1983). Such a comparative determination, in turn, best comports with how we usually measure whether an action is "beneficial."

■ "Reasonableness," on the other hand, is a requirement that is best judged by comparing the nature and complexity of the service rendered with the cost incurred. For example, one might compare the proposed trustee expense—such as accounting fees—to the expense normally incurred in procuring a similar service in a standard commercial setting (and also allowing for any additional difficulties introduced by the bankruptcy setting). *Cf. In re North County Place*, 92 B.R. 437, 449–50 (Bankr. C.D.Cal.1988). Under this approach, an expense may be beneficial, i.e. it will produce

---

**4.** I say "apparently" because the order approving the stipulation contained no account of the bankruptcy court's reasoning in approving the stipulation. Record on appeal, at 28.

a net gain in the secured creditor's recovery, while still being unreasonable because the service rendered was charged at an exorbitant rate. Conversely, a service charged at the prevailing commercial rate may be reasonable, while still failing to be beneficial. Appellees' suggested standard for establishing reasonableness threatens to amalgamate the two inquiries, a step that would be improper in light of the statutory language establishing the independent requirements of reasonableness and beneficialness.

In the present case, there is no indication that the $1,000 per lot is a reasonable fee; rather, the record is simply silent on this point. There is no mention, for example, of how the $1,000 figure was established. This includes a complete silence with respect to what relationship the $1,000 figure bears, if any, to the fees that an accountant could normally be expected to charge for the services contemplated and a complete silence regarding the nature and complexity of the services that the accountants are expected to render.

■ In addition to failing to establish that the accounting fees are reasonable, the record is silent on what impact an accountant's work could be expected to have on the value of the secured property. Absent testimony that the accountant's work will produce some increase (or prevent a decrease) in the value of the Phase V properties, it is impossible to conclude that the accountant's work will benefit the secured property.[5] A fortiori, it is equally impossible to determine the extent of the benefit,

in order to compare the benefit with the costs proposed to be incurred.

The debtors respond by citing several bankruptcy cases in which accountant fees have been permitted. See Appellee's brief at 20–21 (citing In re North County Place, Ltd., 92 B.R. at 448–49 and In re Meade Land Development Co., 527 F.2d 280 (3d Cir.1975)). Such citations, however, demonstrate only that in other circumstances accountant fees were beneficial to the value of the secured property. The cases do not establish that such fees are always beneficial, or more particularly, that they will be beneficial in this case. In such a circumstance as this, where the record contains little or no evidence on the value of the benefit, it was clear error to approve the payment of accountant fees. I will therefore vacate the bankruptcy court's order approving the accountant fees and remand for further consideration on this issue.

### 2. Attorney Fees

■ The testimony regarding attorney fees was little different from that regarding accountant fees. Mr. Trenge testified that (1) he and his wife had no present source of income, nor did they have any funds to pay their attorneys absent proceeds from the sale of property; (2) he had directed counsel to assist him in liquidating certain of the Trenge real estate holdings; (3) his counsel had participated in the negotiations with Valley Federal leading to the stipulation whose approval is the subject of this appeal; and (4) his counsel had participated in efforts to ready the Phase V properties for sale. Transcript at 15–17.

5. Mr. Trenge did testify that the laying of base course paving on the roads serving the 21 lots of Phase V would increase the value of those lots from $40,000 to $80,000, as such base course paving is a prerequisite to obtaining occupancy permits from the local municipality. Transcript at 10. (The testimony leaves unclear whether the increase in value was per lot, or rather, whether the Phase V lots in total would increase in value from $40,000 to $80,000. The debtors' brief on appeal suggests the testimony was meant to be a per lot figure, a fact which I will assume to be true. See appellees' brief at 13–14.) The bankruptcy court found Mr. Trenge's testimony to be credible and unrebutted and therefore approved an $80,000 payment to do

the roadwork. Transcript at 28. The propriety of that decision is not challenged on appeal. I note, however, that an expenditure that promises a return in excess of 1,000% ($40,000 increase in value per lot times 21 lots divided by the $80,000 investment), as I must assume the paying investment to be, almost certainly satisfies the § 506(c) requirements of reasonableness, necessity and beneficialness. However, as there was no testimony attempting to apportion part or all of the accountant fees to the debtors' successful arrangement of the base course paving, this increase in value cannot be claimed as a beneficial effect of the proposed § 506(c) accounting fees.

However, as with the accountant fees, such testimony fails to establish that the proposed payment satisfies the requirements of § 506(c). There was no testimony that would tend to establish such expenses as reasonable, nor was there any that establishes the amount of the benefit that the proposed attorney services would produce.[6] The considerations here are essentially identical to those discussed with respect to the accountant fees, *supra*, so I need not examine this issue in any more detail. Again, I will vacate the bankruptcy court judgment and remand for further consideration.

### 3. Living Expense Fund

■ Mr. Trenge's testimony regarding his own activities was much more extensive than that offered regarding the accountant and attorney fees. The testimony, which the bankruptcy judge found to be uncontradicted, transcript at 28, tends to establish the following:

1. Mr. Trenge has been a licensed realtor for twenty-two years and a building contractor for sixteen years, transcript at 7–8;

2. From the time that the bankruptcy petition was filed, Mr. Trenge and his wife had been at work full-time in attempting to arrange financing and other essentials in order to permit the development to go forward, *id.* at 10–12, 17;

3. Mr. Trenge's work was an important component in arranging the base course paving that was expected to double the value of the Phase V lots, *id.* at 9–11;

4. Neither Mr. Trenge nor his wife have any source of income except the funds to be provided under the stipulation or those that could be earned in full-time employment unrelated to the development, *id.* at 16–17.

This evidence, read in the light most favorable to the debtors, supports the claim that some payment of funds was necessary if the Trenges were to remain involved in efforts to improve and market the Phase V lots. Absent such a payment, the Trenges would have been forced to seek other employment.

The testimony also establishes that the payment of expenses to the Trenges is reasonable. The debtors asserted in their brief to the bankruptcy court that "the Trenges have performed evaluative services that either their counsel or their accountants would have spent far greater time performing had the Trenges not been available." Record on appeal, at 43. In other words, employing the Trenges is likely to be the most efficient and least expensive means of continuing efforts to market the Phase V lots. That assertion, in turn, was adequately supported by Mr. Trenge's testimony establishing that the Trenges are the parties most familiar with the development and by Mr. Trenge's recitation of his professional qualifications.

That leaves only the question whether payment of fees to the Trenges would confer a benefit on the secured creditors, and if so, the extent of the benefit so conferred. The evidence on this question is problematic. As noted above, Mr. Trenge did testify that the laying of base course paving would double the value of the lots. See n. 5, *supra*. Mr. Trenge also testified that he had a role in arranging the base course paving. Thus, it might be appropriate to attribute the increase in value resulting from the base course paving at least partially to Mr. Trenge's efforts. That increase in value, in turn, would constitute a benefit under the statute. See *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94–95 (3d Cir.1986) (a favorable change in the balance sheet bottom line constitutes a benefit).

Nonetheless, the record contains sufficient ambiguity that it would be premature to approve the payment to the Trenges as a legitimate § 506(c) expense. First, I note that the bankruptcy order approving the payment contained no statement of the reasons supporting the order. Thus, it is impossible to determine if the bankruptcy court relied on the increase in value result-

---

**6.** As with the accounting fees, there was no evidence linking attorney services with the solicitation and provision of the base course paving

which, in turn, was expected to produce the dramatic increase in value. See n. 5, *supra*.

ing from the base course paving as the benefit justifying the payment of fees. Relatedly, the stipulation links the Trenge payments to *future* lot sales from Phase V. This suggests that the payments to the Trenges may have been envisioned as compensation for *future* services. If this is the case, approval of the payments may be erroneous, as there was no testimony on what future benefits could be expected to flow from the Trenges' continued efforts to market the properties. Finally, I note that the expenses to be paid the Trenges are designated a "living expenses fund." This at least suggests that the amount of funds to be paid the Trenges was established without regard to the benefit that would be conferred on the secured creditors, and instead was adopted with only the Trenges' needs in mind.

■ In holding that the present record is insufficient to support the payment of the accountant, attorney and living expense costs, I do not intend to suggest that only improvements in the secured creditor's position that are susceptible to *precise* quantification may be counted as beneficial under the statute. As the Third Circuit has recognized, preserving the going concern value of a business can constitute a benefit under the statute. *Id.* at 94 (citing *In re Afco Enterprises*, 35 B.R. at 515). In turn, the increased value to be realized from maintaining a business as a going concern, rather than selling that business's assets off piece-meal or after the business has been closed, may be difficult to establish exactly. See *In re Afco*, 35 B.R. at 516. Nonetheless, it is still incumbent on the trustee seeking the payment of costs to establish that some benefit has been produced, or will be produced, by incurring

those costs and to provide at least some rough estimate of the extent of the benefit so conferred.[7]

The debtors assert in their brief on appeal that, while they are not maintaining an operational entity, their efforts are targeted at protecting a going concern value bound up in the Phase V development. Appellees' brief, at 13. However, the debtors introduced no evidence at the bankruptcy hearing that would support the conclusion that the Springhouse V development will be substantially more valuable if the lots are developed and sold as a group, rather than sold piece-meal, as might occur if the Phase V properties were foreclosed. In this respect the debtors' reliance on *In re Afco* is misplaced. In *Afco*, the trustee seeking to recover costs introduced extensive evidence of the amount of the additional financial recovery that was realized as a result of the trustee maintaining the debtor's property as a going concern. There has been no such showing here. In light of this failure to prove benefit, the bankruptcy court's order must be vacated and the case remanded for further consideration.

A final point is in order. Meridian Leasing objected to all three payments on the ground that the payment scheme is insufficiently nuanced to create an appropriate charging of cost to those receiving the benefit. It argues that even conceding that the proposed expenses may provide some benefit to some secured creditors, the stipulation still holds the potential to reduce the security of secured creditors who have reaped no benefit, simply because their security is the first sold. At the same time, secured creditors who *have* benefitted from the costs incurred may escape with their security completely unimpaired simply be-

---

7. The debtors claim that the Third Circuit's *In re McKeesport* decision, which recognizes the maintenance of going concern value as a potential benefit to secured creditors, also establishes that non-quantifiable benefits may be claimed by the trustee seeking to recover costs. It is unclear whether *McKeesport* should be read so broadly. *McKeesport* adopted the view set out in *In re Afco* that the term benefit may include activity to preserve going concern value. However, in *Afco* the trustee attempted to quantify the increased return that resulted from the pres-

ervation of the going concern value. Thus, while *McKeesport* suggests that the definition of benefit may be quite expansive, *McKeesport* perhaps does not eliminate the trustee's burden of quantifying the extent of the benefit conferred. It is unnecessary to resolve the question of how *McKeesport* is best read, however, as in this case the debtors provided neither a quantitative or other description of the extent of benefit which would be conferred through their receipt of a living expense fund.

cause the lot in which they held an interest was among the last sold.

This objection is one that is best considered on remand concomitant with the bankruptcy court's consideration of the extent of benefit that the Trenge, attorney and accountant costs can be expected to generate. For now it is sufficient to observe that the allocation of costs may not be susceptible to precise delineation. It seems entirely plausible, for example, that the Trenges' costs may be properly allocated to the Phase V property, without being able to more precisely delineate which of the particular lots within Phase V, if any, enjoyed the greatest benefit. In such circumstance, the bankruptcy court is free to proceed on the best information available, even if that information admittedly guarantees only a rough congruence of cost allocation to benefit received.

## III. CONCLUSION

For the foregoing reasons, the order of the bankruptcy court will be vacated and the case remanded for further consideration consistent with this opinion.