In the Matter of SAYBROOK
MANUFACTURING CO.,
INC., Debtor.

In re CLINTON MARINE PRODUCTS,
INC., Debtor.

In re SERO HOLDINGS, INC., Debtor.

In re the SERO COMPANY, a/k/a Sero of New Haven, a/k/a Ms. Sero, a/k/a Par–Ex, a/k/a Wrecked, a/k/a Scoundrel, a/k/a Jennifer Kirk, a/k/a C.J. Taft, Debtor.

Bankruptcy Nos. 88–52607, 88–52608, 88–52609 and 88–52610.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Sept. 4, 1991.

Matthew D. Williams, Marietta, Ga., for Fulcrum Intern., Ltd.

Lee Brooks Rivera, Atlanta, Ga., for Mfrs. Hanover Trust Co.

Wesley J. Boyer, Macon, Ga., for debtors.

Mark Roadarmel, Asst. U.S. Trustee, Macon, Ga., for U.S. trustee.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Fulcrum International, Ltd. (Fulcrum) filed a "Request for Disbursement of Funds in Payment of Court Approved Professional's Fees" on February 5, 1990. Fulcrum asked the Court to order Manufacturers Hanover Trust Company (Manufacturers Hanover) to pay Fulcrum's professional fees and expenses from the proceeds of the sale of assets of Saybrook Manufacturing Co., Inc., Clinton Marine Products, Inc., Sero Holding, Inc., and The Sero Company (collectively "Sero"). Manufacturers Hanover[1] filed a response on February 13, 1990, asking that Fulcrum's request be denied. This Court entered an order denying Fulcrum's motion on April 4, 1990.[2] The district court reversed in part and remanded to this Court.[3] A hearing, after remand on Fulcrum's motion, was held on July 2, 1991. The Court, having considered the record and the arguments of counsel, now publishes this memorandum opinion.

The issue before the Court is whether it should award and order payment of compensation under section 506(c) of the Bankruptcy Code[4] notwithstanding a prior court order limiting the amount of professional fees chargeable against Manufacturers Hanover's collateral.

Sero is a clothing manufacturer that was facing financial difficulty in the fall and winter of 1988. Fulcrum is an investment and merchant banking firm. Sero and Fulcrum entered into an agreement on December 12, 1988, in which Sero agreed to pay Fulcrum eight percent of the principal amount of any equity investment arranged by Fulcrum. Sero also agreed to reimburse Fulcrum for reasonable expenses.

Sero filed a petition[5] under Chapter 11 of the Bankruptcy Code on December 22, 1988. Fulcrum continued to seek funding for Sero postpetition. Fulcrum did not apply for required court approval for postpetition professional services rendered on behalf of Sero until October 19, 1989. Fulcrum had no prior bankruptcy experience and was not aware of the need for court approval. Fulcrum relied upon Sero to handle all "technical matters" relating to the Bankruptcy Court. Fulcrum's postpetition services were conducted with the knowledge of Sero's primary secured creditor, Manufacturers Hanover. On December 5, 1989, this Court granted Fulcrum's application for employment as a professional nunc pro tunc.[6]

Fulcrum contacted several potential investors about an equity investment in Sero. However, all serious investors indicated that they were only interested in purchasing Sero's assets.

Fulcrum introduced Brynwood Partners II L.P. (Brynwood) to Sero. Brynwood is

---

**1.** Manufacturers Hanover's response was filed on behalf of itself and a group of lending banks which had entered into a cash collateral agreement with Sero.

**2.** *In re Saybrook Mfg. Co.,* Ch. 11 Case No. 88–52607 (Bankr.M.D.Ga. April 4, 1990), *rev'd in part, Fulcrum Int'l, Ltd. v. Saybrook Mfg. Co.,* 124 B.R. 141 (M.D.Ga.1991).

**3.** *Fulcrum Int'l, Ltd. v. Saybrook Mfg. Co.,* 124 B.R. 141 (M.D.Ga.1991).

**4.** 11 U.S.C.A. § 506(c) (West 1979).

**5.** Each affiliate of Sero filed a separate bankruptcy petition. The Court entered an order on December 23, 1988, authorizing joint administration of these bankruptcy cases pursuant to Bankruptcy Rule 1015.

**6.** *See In re Saybrook Mfg. Co.,* 108 B.R. 366, 369 (Bankr.M.D.Ga.1989).

an investment limited partnership that makes equity investments in public and private companies. Brynwood would not have been aware of the Sero opportunity but for the efforts of Fulcrum. Brynwood had numerous meetings and telephone calls with Fulcrum concerning Sero. Brynwood understood that an employment agreement existed between Fulcrum and Sero. Manufacturers Hanover was aware of Fulcrum's efforts in arranging the sale of Sero's assets.[7]

On June 30, 1989, this Court entered an order approving the sale of virtually all of Sero's assets and the assignment of leases and executory contracts to Brynwood for $3,775,000. Manufacturers Hanover was paid the proceeds of the sale because of its secured status. The Court later determined that Fulcrum was entitled to compensation and reimbursement of expenses of $75,296.31 under section 330(a) of the Bankruptcy Code.[8] The Court did not address the source from which Fulcrum could recover its award.[9]

On April 4, 1990, this Court held that Fulcrum's award was subordinate to Manufacturers Hanover's superpriority status.[10] Thus, Fulcrum could not recover its award from the sale proceeds under section 503(b) of the Bankruptcy Code.[11] This Court also determined that Fulcrum lacked standing to recover its award under section 506(c).[12]

Fulcrum appealed to the district court, which reversed this Court. The district court stated: "Under the circumstances of this case, the court finds that Fulcrum does have standing to seek a recovery of its fees under section 506(c)." *Fulcrum International, Ltd. v. Saybrook Manufacturing Co.*, 124 B.R. 141, 145 (M.D.Ga.1991).

Fulcrum now contends that it is entitled to be paid an award under section 506(c) from the proceeds of sale. This presents two questions: First, what is the proper amount, if any, of compensation that Fulcrum is entitled to under section 506(c); and second, should the Court order Manufacturers Hanover to pay the compensation from the proceeds of sale?

Section 506(c) provides:

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C.A. § 506(c) (West 1979).

 Fulcrum contends that this Court already has determined the proper amount of compensation. Manufacturers Hanover contends that this Court's award under section 330(a) is not conclusive on the request for compensation under section 506(c). Although the statutory language of section 330(a) and section 506(c) is similar, the Court is persuaded that it should consider Fulcrum's compensation request specifically under the requirements of section 506(c).

 Under section 506(c), Fulcrum must show that the services for which it seeks compensation (1) were reasonable, (2) were necessary, and (3) benefited Manufacturers Hanover. *French Market Homestead, FSA v. P.C., Ltd. (In re P.C., Ltd)*, 929 F.2d 203, 205 (5th Cir.1991); *In re Trim–X, Inc.*, 695 F.2d 296, 299 (7th Cir.1982); *Bank of Honolulu v. Anderson (In re Anderson)*, 66 B.R. 97, 99 (9th Cir.BAP 1986).

 Fulcrum has the burden of proving these elements. *In re P.C., Ltd*, 929 F.2d at 205; *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Food Services Corp.)*, 739 F.2d 73, 77 (2d Cir. 1984); *Brookfield Production Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir.1984).

**7.** *Id.* at 367.

**8.** 11 U.S.C.A. § 330(a) (West Supp.1991).

**9.** *In re Saybrook Mfg. Co.*, 108 B.R. at 371.

**10.** *See* 11 U.S.C.A. § 364(c)(1) (West 1979).

**11.** *See* 11 U.S.C.A. § 503(b) (West 1979 & Supp. 1991).

**12.** *In re Saybrook Mfg. Co.*, Ch. 11 Case No. 88– 52607 (Bankr.M.D.Ga. April 4, 1990), *rev'd in part, Fulcrum Int'l, Ltd. v. Saybrook Mfg. Co.*, 124 B.R. 141 (M.D.Ga.1991).

Sero filed a Chapter 11 bankruptcy petition, intending to reorganize. The reorganization efforts failed, and Sero's business began to decline rapidly. Seymore Shapiro and Jeffrey Shapiro filed a motion to convert the Chapter 11 reorganization case to a Chapter 7 liquidation case on May 2, 1989. Manufacturers Hanover filed a motion to begin liquidation of Sero's assets on May 30, 1989. Thus, Sero was faced with imminent liquidation. The Court held an expedited hearing on the sale of virtually all of Sero's assets on June 9, 1989.

Seymore Shapiro entered a cash bid of $2,200,000, plus abandonment of the Shapiros' unsecured claim. Brynwood entered a "net" bid of $3,775,000, which the Court accepted as the highest and best bid. Brynwood's bid was the only offer to which Manufacturers Hanover consented. Manufacturers Hanover was the largest secured and unsecured creditor.

Manufacturers Hanover contends that Fulcrum's services were not necessary and did not benefit Manufacturers Hanover. Manufacturers Hanover contends that the liquidation value of Sero was $3.71 million not including the "Branford Lease." Thus, Manufacturers Hanover contends that it would have received the same amount without Fulcrum's services.

In considering whether Fulcrum's services were reasonable and necessary, the Court notes that Sero was in serious financial trouble. No serious investor was willing to make an equity investment in Sero. Manufacturers Hanover had filed a motion to begin liquidation. A liquidation would have been devastating to the employees and local community. Brynwood would not have known of Sero but for the efforts of Fulcrum. Brynwood's bid was the only offer consented to by Manufacturers Hanover. Fulcrum's efforts enabled Sero to be sold as a going concern. The Court is persuaded that Fulcrum's services were necessary.

Fulcrum contends that investment bankers do not customarily charge for services on an hourly basis. Sero and Manufacturers Hanover do not dispute this contention. Fulcrum urges the Court to award a commission as its section 506(c) compensation.[13]

The Court is persuaded that Fulcrum adequately performed the services of an investment banker and that its award under section 506(c) should be considered on a commission basis. Fulcrum also seeks $296.31 in expenses. In view of the results, the Court is persuaded that the services that Fulcrum rendered were reasonable.

Manufacturers Hanover contends that the Court should award compensation, if at all, based on a two percent commission on the difference between Seymore Shapiro's bid of $2.2 million and Brynwood's bid of $3.775 million. Thus, Manufacturers Hanover contends that Fulcrum is entitled to $31,500 (that is, $3.775 million less $2.2 million × 2%). Fulcrum urges the Court to affirm its prior award of $75,296.31.[14]

In *Bank of Honolulu v. Anderson (In re Anderson)*,[15] the bankruptcy appellate panel upheld the bankruptcy court's award of a five percent real estate commission under section 506(c). The appellate panel stated:

> Courts have narrowly interpreted the term "benefit to the secured creditor". *In re Proto–Specialties, Inc.*, 43 B.R. 81, 83 ([Bankr.] Ariz.1984). However, the Bank argues for an even narrower interpretation than previously adopted by any court. The Bank contends that no benefit was conferred on it by the sale of the property. The Bank was prepared to foreclose in state court at the time of the filing of the petition. However, the Bank's ability to pursue a state foreclosure sale does not mean that Bradley's actions conferred no benefit on the Bank. *In re Truitt*, 15 B.R. 169, 172 ([Bankr.] N.Ga.1981); *contra, In re Modern Mix, Inc.*, 18 B.R. 746, 749 ([Bankr.] S.Ala.1982).

---

**13.** *See In re Saybrook Mfg. Co.*, 108 B.R. at 370–71.

**14.** *Id.* at 371.

**15.** 66 B.R. 97 (Bankr.App. Panel 9th Cir.1986).

We read the Code to provide for the payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors. *See In re Marino*, 794 F.2d 1367, 1370 (9th Cir.1986); *In re Neu–Deli Corp.*, 19 B.R. 175, 176 (S.Ala.1982); *In re Wyckoff*, 52 B.R. 164, 168 (W.Mich.1985).

If the Bank had been allowed to foreclose, it would have borne foreclosure expenses and presumably would have hired a real estate agent.

. . . .

If the Bank believed that the property was sold at a below-market price, it could have contested the sale. However, the Bank did not do so. The Bank is trying to benefit at the expense of an outside professional whose work directly benefited the Bank.

. . . .

We disavow decisions which limit Section 506(c) expenses to the amount of the foreclosure cost saved by the lienholder such as *In re Codesco*, 18 B.R. 225, 229 ( [Bankr.] S.N.Y.1982) and *In re Truitt, supra*, 15 B.R. at 171. Such a limitation stems from a fundamental misreading of both the statute and its legislative history. No such limitation is contained in the wording of the statute.

. . . .

For the reasons given above, we hold that a commission to a third party real estate broker is of benefit to a secured party. 11 U.S.C. § 506(c). It is not necessary that a secured party consent to such an expense.

66 B.R. at 99–100.

In *In re McKeesport Steel Castings Co.*, [16] the circuit court stated:

[I]n *In re Afco Enterprises, Inc.*, 35 B.R. 512 (Bankr.D.Utah 1983), the court adopted a much broader formula for determining benefit. The court stated that: "The definition of benefit encompasses more than the bottom line of a balance sheet. Preservation of the going concern value of a business can constitute a benefit to the secured creditor." *Id.* at 515. *See also In re World of English, N.V.*, 21 B.R. 524, 527–28 ( [Bankr.] N.D.Ga.1982) (applying liberal interpretation in holding that keeping debtor in business constituted preservation of property).

We choose to follow the broad interpretation of benefit used in *Afco Enterprises*.

799 F.2d at 94.

In *New Orleans Public Service, Inc. v. First Federal Savings and Loan Association of Warner Robins, Georgia (In re Delta Towers, Ltd)*, [17] the circuit court stated:

Courts have construed the benefit element as requiring that the claimant incur the expenses primarily for the benefit of the secured creditor and that the expenses resulted in a quantifiable direct benefit to the secured creditor. *In re Cascade Hydraulics & Utility Service, Inc.*, 815 F.2d 546, 548 (9th Cir.1987); *Brookfield Production*, 738 F.2d at 952; *In re Beker Industries Corp.*, 89 B.R. 336, 342 (S.D.N.Y.1988). Indirect or speculative benefits are insufficient. *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir.1985) *("Flagstaff II")*. At the same time, expenses which benefit the debtor or other creditors rather than the secured creditor himself are immaterial. *Flagstaff I*, 739 F.2d at 76.

924 F.2d at 77.

In *Reconstruction Finance Corp. v. Rhodes*, [18] a Bankruptcy Act case, the former Fifth Circuit stated:

The rule is well settled that, where the lien creditor in a mortgage or deed of trust does not consent to a sale free of liens, his contribution to the bankruptcy estate is limited to the cost of foreclosure under state law. . . . In L. Maxcy, Inc., v. Walker, 5 Cir., 119 F.2d 535, 536, certiorari denied 314 U.S. 647, 62 S.Ct. 90, 86 L.Ed. 519, this court said: "It is settled in this circuit by numerous decisions

**16.** 799 F.2d 91 (3rd Cir.1986).

**17.** 924 F.2d 74 (5th Cir.1991).

**18.** 214 F.2d 606 (5th Cir.1954).

that in such event the mortgage holder cannot be compelled to contribute to the general fund of the estate more than the reasonable cost of selling the encumbered property, usually to be measured by the actual cost in a state court of foreclosing the lien."

214 F.2d at 607.

In the case at bar, Manufacturers Hanover consented to the sale of Sero as a going concern. Manufacturers Hanover knew that Fulcrum was working with Sero. Only two offers were presented to the Court at the hearing on the expedited sale. But for the efforts of Fulcrum, there would likely have been only one bidder, Seymore Shapiro. Brynwood's offer was the only offer consented to by Manufacturers Hanover.

The Court has considered the value of the services that Fulcrum rendered and is of the opinion that Fulcrum is entitled to compensation in the amount of $75,000, which is the sum previously awarded by the Court under section 330(a). This amount is about two percent of the sale price and is about 4.76 percent of the difference between Brynwood's bid and Seymore Shapiro's bid. The Court finds that Fulcrum has documented and is entitled to

reasonable expenses of $296.31. Thus, Fulcrum is entitled to a total of $75,296.31.

The Court now turns to the question of whether it should order Manufacturers Hanover to pay Fulcrum's award from the proceeds of sale.

Sero filed its Chapter 11 bankruptcy petition on December 22, 1988. On December 23, 1988, Manufacturers Hanover agreed to advance Sero a $2 million line of credit and to allow Sero to use $1 million of collateral. This postpetition lending facility was secured by virtually all prepetition and postpetition assets of Sero. The agreement provided that Manufacturers Hanover would subordinate its lien and security interest for the payment of not more than $150,000 in aggregate professional fees and expenses.[19]

■ The Court entered an "Emergency Order Authorizing Use of Cash Collateral and Secured Borrowing" on December 23, 1988. The order granted Manufacturers Hanover a superpriority over all administrative expenses incurred in the reorganization proceeding of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code [20] except for payment of $150,-000 in professional fees and expenses.[21]

---

**19.** Paragraph 13(c) of the "Conditional Consents to Emergency Use of Cash Collateral and Proposal for Secured Borrowing" filed on December 23, 1988, provides in relevant part:

13. Subject to the provisions of paragraph 5 hereof, neither Collateral nor Cash Collateral may be used by Sero for any purpose except payments to the Banks ... or

....

(c) professional fees awarded by the Bankruptcy Court to professionals employed by Sero; provided that each of said professionals shall apply against all fees awarded to it, its retainer, if any, before any Collateral or Cash Collateral held by the Agent shall be paid to it; .... Nothing herein shall be deemed or construed as a waiver of any right (i) to object to any request for compensation or reimbursement filed by such professionals, or (ii) to recover from Collateral or Cash Collateral any cost or expense recoverable under section 506(c) of the Code including, without limitation, compensation or reimbursement of professional persons retained by Sero with Court approval. Sero and the Subsidiaries have advised the Banks that estimated aggregate professional fees and expenses over the Budget

Periods accruing from the Petition Date through 180 days thereafter shall not exceed $150,000. The Banks, and the Agent, in its individual capacity, upon approval by the Court of this Consent, agree to subordinate the lien and security interests granted hereunder only to payment of amounts not exceeding $150,000.00 without limitation of any right of the Banks to object to any request for such compensation or reimbursement.

**20.** 11 U.S.C.A. § 503(b) (West 1979 & Supp. 1991); 11 U.S.C.A. § 507(b) (West 1979).

**21.** Paragraph 4 of the "Emergency Order Authorizing Use of Cash Collateral and Secured Borrowing" provides as follows:

4. Without limitation of the liens and security interests otherwise granted hereby and as otherwise provided by paragraph 13(c) of the Consent, all such indebtedness which may from time to time hereafter be owing by the Debtors to the Secured Parties shall have priority under the provisions of Section 364(c)(1) of the Code over all administrative expenses incurred in the reorganization proceeding of the kind specified in Section 503(b) or Section

On January 31, 1989, the Court entered a final order confirming the emergency cash collateral order. The Court entered a supplemental order regarding cash collateral and secured financing on February 3, 1989.

Sero's reorganization efforts failed. The Court approved the sale of virtually all of Sero's assets to Brynwood for $3,775,000. Paragraph (f) of the order approving the sale entered on June 30, 1989, provides as follows:

> (f) The proceeds of sale of $3,775,000 shall be paid to the Banks subject to the claim of the Debtors' professionals incurred in connection with the sale and this Order, the priority claim of professionals as established by the Financing Order, or claims under 11 U.S.C. § 506(c), and the following provisions:
>
> (i) The banks file an accounting with the Court reflecting all payments received on this claim;
>
> (ii) the Banks shall remain subject to the jurisdiction of the Bankruptcy Court; and
>
> (iii) the Banks account for and pay over to the Debtors any amounts which they receive as proceeds of any lien or priority granted by the Bankruptcy Court which is reversed on appeal (to the extent that any such amount would not otherwise be payable to the Banks).

Manufacturers Hanover continues to hold the sale proceeds. Fulcrum contends that it is entitled to payment of its award under section 506(c) from the sale proceeds. There are no other assets in the bankruptcy estate from which Fulcrum can be paid.

Fulcrum filed its application for compensation and reimbursement of expenses on October 19, 1989. The record shows that this Court already had awarded professional fees and expenses in excess of the $150,000 limit.

Manufacturers Hanover does not contend that a section 364(c) superpriority lien is superior to a claim under section 506(c). *See Guy v. Grogan (In re Staunton Industries, Inc.)*, 74 B.R. 501, 507 (Bankr. E.D.Mich.1987) (superpriority secured creditor not exempt from section 506(c) assessment). *See generally In re Flagstaff*, 739 F.2d at 75.

Rather, Manufacturers Hanover contends its liability for section 506(c) awards is subject to the $150,000 professional fee limitation contained in the emergency cash collateral order. Neither Fulcrum nor Manufacturers Hanover cite any case law on this issue.

The only case the Court could find with similar facts, which admittedly is not on point, was *Central Bank of Montana v. Cascade Hydraulics and Utility Service, Inc. (In re Cascade Hydraulics and Utility Service, Inc.)*. [22] After the debtor filed its bankruptcy petition, the bank allowed the use of its cash collateral to pay limited administrative expenses. The reorganization failed and the debtor's assets were sold. The bankruptcy court ordered payment of administrative expenses from the proceeds. The administrative expenses included telephone expenses, federal withholding taxes, social security taxes, attorney fees, and payment to the debtor's president. [23] The circuit court reversed, stating that those administrative expenses did not benefit the bank as required by section 506(c). The bank, however, did not contest

---

507(b) of the Code excepting professional expense referred to in ¶ 13(c) of the Consent and shall at all times be senior to the rights of the Debtors and any successor trustee in this or any subsequent proceeding under the Code. No costs or expenses of administration which have been or may be incurred in these proceedings, any conversion of these proceedings or in any proceeding resulting from a conversion pursuant to Section 1112 of the Code, or in any other proceeding related hereto, and no priority claims are or will be prior to or on

a parity with the claim of the Secured Parties against the Debtors arising out of extensions of credit made by the Secured Parties to the Debtors, or with the security interests and liens of the Secured Parties; and no such costs or expenses of administration shall be imposed against the Secured Parties, their claims or their collateral.

**22.** 815 F.2d 546 (9th Cir.1987).

**23.** *Id.* at 547.

the payment of *costs* associated with the sale of its secured collateral.[24]

■ It is settled law that administrative expenses and general costs of reorganization generally cannot be charged against secured collateral. *In re Cascade Hydraulics and Utility Service, Inc.*, 815 F.2d at 548; *In re Flagstaff,* 739 F.2d at 76; *In re Trim–X,* 695 F.2d at 301; *First Western Savings and Loan Association v. Anderson,* 252 F.2d 544, 547 (9th Cir.1958); *In re Staunton Industries,* 74 B.R. at 504.

■ The reason for the rule is that the bankruptcy trustee acts not on the authority of the secured creditors and for their interests, but on the authority of the court and for the interest of the general creditors. *In re Trim–X,* 695 F.2d at 301; *Robinson v. Dickey,* 36 F.2d 147, 149 (3rd Cir.1929), *cert. denied,* 281 U.S. 750, 50 S.Ct. 354, 74 L.Ed. 1161 (1930).

■ However, if expenses for the preservation or disposition of property are incurred primarily for the benefit of a secured creditor holding a security interest in the property, such expenses, properly identified, may be charged against the secured creditor. *In re Cascade Hydraulics and Utility Service,* 815 F.2d at 548; *In re Flagstaff,* 739 F.2d at 76; *In re Trim–X,* 695 F.2d at 301; *In re Staunton Industries,* 74 B.R. at 504.

In *Fulcrum International, Ltd. v. Saybrook Manufacturing Co.,* the district court stated:

> In the court's considered opinion, the purpose of section 506(c) is to shift the cost of preserving or disposing of a secured creditor's collateral from the estate to the secured party.... Thus, even though Fulcrum has rendered services and expended sums in disposing of Sero's assets and the Banks' collateral, the latter now contend that Fulcrum should bear the cost of a benefit conferred on the Banks. In the court's judgment such a result is at odds with the intentions of the drafters of section 506(c).

....

> In the court's considered judgment, "a secured creditor who received a direct benefit from the rendition of services or provision of goods by an administrative claimant of the estate should have the collateral charged for such benefit...."

124 B.R. at 144–45.

The emergency cash collateral order was entered the day after Sero filed its bankruptcy petition. Sero's attorney has stated that the purpose of the $150,000 provision was to pay Sero's attorney fees. Sero advised Manufacturers Hanover that the estimated professional fees and expenses during the first 180 days following the bankruptcy filing would not exceed $150,000.

When the emergency cash collateral order was entered, Sero planned to reorganize its operations rather than to liquidate. The Court is persuaded that the purpose of the $150,000 limit was to enable Sero to pay its attorney fees rather than to provide for section 506(c) compensation. But for the efforts of Fulcrum, the sale for $3,775,000 would not have occurred. Fulcrum's efforts increased the recovery by Manufacturers Hanover and eliminated liquidation and marketing expenses and uncertainty that otherwise would have been borne by Manufacturers Hanover.

Fulcrum's efforts directly benefited Manufacturers Hanover rather than the general unsecured creditors. Manufacturers Hanover would receive a windfall from Fulcrum's efforts should the Court deny Fulcrum's request.

The Court, therefore, holds that Fulcrum is entitled to recover $75,296.31 from the proceeds of sale being held by Manufacturers Hanover.

---

**24.** *Id.* at 548, n. 1.