In the Matter of IBERICA
MANUFACTURING,
INC., Debtor.

Bankruptcy No. 87–01898 (ESL).

United States Bankruptcy Court,
D. Puerto Rico.

March 31, 1995.

Richard A. Lee, Richard A. Lee Law Office, San Juan, PR, for Diego Ferrer, Trustee.

Jorge Souss, Goldman, Antonetti & Cordova, San Juan, PR, for creditor Government Development Bank of Puerto Rico.

## OPINION AND ORDER

ENRIQUE S. LAMOUTTE, Chief Judge.

Before the court is Trustee's Report On Sale (docket No. 197, filed on July 8, 1994) of debtor Iberica Manufacturing, Inc.'s real property located at Calle Munoz Rivera # 49, Juncos, Puerto Rico. The report of the sale conducted on May 31, 1994 contains a summation of costs as well as the commission paid to the trustee from the proceeds. Although the real property was encumbered by a mortgage in favor of the Government Development Bank for Puerto Rico (GDB), the sale was conducted free and clear of liens with the outstanding liens attaching to the proceeds.

GDB submitted its Objection to Payment of Trustee's Commission, Trustee's Counsel's Notarial Fees and Closing Fees (docket No. 198, filed on July 14, 1994) asserting that the trustee is not entitled to claim these fees and costs against the sale proceeds.

This matter was set for a hearing on November 14, 1994. The trustee did not submit a written reply to GDB's Opposition and his presentation at the hearing was devoid of any legal analysis.[1] Thereafter, the trustee filed a Motion for Resolution of Pending Matter (docket No. 205, filed on February 2, 1995).

Also outstanding in this case is the payment of a court authorized (docket No. 27) administrative expense for security services provided for debtor's real property from February 4, 1988 through December 15, 1989. The claim totals forty-two thousand, eight hundred and forty dollars ($42,840.00) (docket Nos. 128 & 151). The trustee does not object to the claim (docket No. 137) and requests that GDB be required to pay for the services as they directly benefited therefrom.

---

1. The trustee simply represented to the court that to disallow these items would send the derogatory message to all trustees that a creditor could effectively "blackmail" a debtor while denying that blackmail actually occurred in this case.

GDB did not file an opposition, however, in its Motion to Amend Order of Private Sale (docket No. 191) GDB requested that the court amend its order to include that the estate is not entitled to recover the costs for the security services from the proceeds of the sale.[2]

## I. FACTS

The issues before the court stem from the long delayed sale of the collateral by the trustee and the question as to whether he is entitled to costs generated by the sale, as well as trustee's commissions from the proceeds, even though the sale did not fully secure the debt or provide equity to the estate.

The procedural history of this case is extremely complex as witnessed by the numerous filings and the various contested matters in the record. In order to resolve the issue at hand, however, the court must focus on the conduct of the involved parties throughout the case relating to the issues of valuation, abandonment and the eventual sale of the debtor's property which was secured by the claim held by GDB.[3] Although confining a discussion of the facts to these areas, the information is voluminous. Therefore, the court will rely on several filings which reconstruct the history of the case.[4]

Debtor filed a voluntary bankruptcy petition under chapter 11 on August 28, 1987. On December 10, 1987 the case was convert-ed to chapter 7. At the time of the conversion, debtor had an outstanding debt of approximately two hundred and fifty thousand dollars ($250,000.00)[5] owed to GDB and secured by its real property and a portion of the machinery and equipment located thereon.[6]

On February 4, 1988 the trustee requested and obtained court authorization to employ security guard services which continued until December 15, 1989. Sometime between February 5 and March 8, 1988 the trustee had taken an inventory of the debtor's machinery and equipment. Thereafter, in the meeting of the creditors held on March 9, 1988 pursuant to 11 U.S.C. § 341, the trustee filed a report estimating the value of debtor's real property at three hundred and twenty-five thousand dollars ($325,000.00) and the machinery and equipment, both encumbered and unencumbered, at one hundred and twenty-one thousand and eight hundred dollars ($121,800.00).

Prior to this, in December, 1987, GDB received authorization to conduct an inventory of the debtor's machinery and equipment which was completed on May 11, 1988. On May 24, 1988 GDB filed a motion indicating that the inventories conducted by the respective parties did not reconcile and further requesting authorization to examine the debtor's president.[7] The parties subsequently met but the attempt to negotiate and settle their differences proved unsuccessful.

---

2. GDB did not provide any legal substantiation for this request. In response, the court denied the request that the costs of the sale, trustee commission and cost of security services not be taken from the proceeds as premature. In its subsequent motion objecting to costs and commission, GDB failed to address the expense for security services. See docket No. 198.

3. It is important to note that none of the parties of interest initially present in this case are currently parties of interest. See Footnotes 10 & 14, infra.

4. The following facts are subtracted from the various pleadings filed by the parties in the adversary proceeding and are uncontested. In particular, the court relies upon the Complaint, Adversary No. 90–0069, Proposed Pre–Trial Order, Adversary No. 90–0069, docket No. 3 and Statement of Uncontested Material Facts, Adversary No. 90–0069, docket No. 13.

5. According to the trustee, interest amounts to an additional eighteen thousand, nine hundred and twenty-one dollars and fifty-six cents ($18,921.56). See Complaint, Adversary No. 90–0069, p. 2 ¶ 6.

6. On or about February 28, 1986 debtor and GDB entered into a financing arrangement whereby GDB would make one or more loans to debtor and that such loans would be secured by a first mortgage lien on debtor's real property and a chattel mortgage on specified machinery and equipment belonging to debtor. See Proposed Pre–Trial Order, Adversary No. 90–0069, docket No. 3, pp. 2 & 3.

7. GDB alleged that some machinery and equipment listed in the inventory were missing from the premises.

The trustee filed a motion for approval to abandon certain of the chattel property which was entertained by the court on September 2, 1988. During that hearing the court granted GDB's request to conduct a second inventory of the chattel. This was completed on September 9, 1988 wherein the GDB estimated the value of the inventory at sixty-four thousand, eight hundred and seventy dollars and sixty-five cents ($64,870.65).[8]

At the request of the trustee, a second hearing for abandonment of particular equipment was held on October 26, 1988. The court denied this request stating the outstanding dispute as to the inventory discrepancies required resolution prior to abandonment.

A status conference on the matter was then scheduled for January 13, 1989. The GDB did not appear and no further action on abandonment was taken until December 11, 1989 when GDB requested an expedited hearing on its October 3, 1988 motion to compel abandonment of the personal and real property of the debtor stating that the estate has no equity in the personal or real property.

Meanwhile, on January 23, 1989 the trustee gave notice of intent to sell debtor's real property for two hundred and ninety-five thousand dollars ($295,000.00) to which the GDB replied on February 6, 1989.[9] Consequently, a hearing on this matter was scheduled for April 25, 1989, however, by this time the offer had expired and had been withdrawn.

The parties met on September 15, 1989 during which the trustee requested that the GDB either sanction the sale of debtor's

property or provide evidence to sustain a request for abandonment since, in his estimation, the property provided substantial equity to the estate.[10] The parties were not able to reach an agreement as GDB's representatives did not have the authority to decide the matter. GDB failed to contact the trustee with its final decision after the appropriate officials were briefed. Rather it wasn't until almost a month later during an informal conversation with opposing counsel that the trustee learned that GDB intended to remain steadfast in its position that the property should be abandoned.

Thereafter, on December 11, 1989 the GDB requested a hearing on its request to compel the trustee to abandon the property which was held on May 8, 1990. A pretrial schedule was set. While continuing to insist on abandonment, GDB admits to failing to substantiate its request with supporting evidence. On June 18 & 22, 1990 GDB had debtor's property appraised.

An adversary proceeding was initiated by debtor on June 22, 1990 requesting that GDB's secured claim be equitably subordinated due to the conduct of the creditor. On June 26, 1990 a pretrial conference was held wherein the court consolidated the contested matter with the adversary proceeding. Accordingly, a pretrial on the issue of abandonment and equitable subordination was set for May 5, 1991. Thereafter, motions for summary judgement were filed in the adversary proceeding and the trial previously scheduled for August 14–16, 1991 was continued.[11]

This was followed by another unsuccessful attempt by the trustee to sell debtor's real

---

**8.** In February 1991 the chattel were eventually sold for five thousand and five hundred dollars ($5,500.00); the low price is attributed to vandalism and idleness. *See* docket Nos. 143 & 144.

**9.** While the parties differ as to whether GDB's reply constituted an objection, it is apparent that the filing raised issues which generated the need for a hearing thereby effectively delaying the sale and resulting in the expiration of the offer. *See* docket No. 73.

**10.** The original trustee resigned on April 26, 1989 and was replaced by the current trustee on

May 11, 1989. It is undisputed that the present trustee requested a meeting with the GDB shortly thereafter, however, the meeting didn't materialize until more than three months later.

**11.** After a trial held on July 6, 1994, the undersigned denied debtor's request for failure to establish that GDB's conduct rises to the level of egregious acts as fraud, spoilation or overreaching. *In re 604 Columbus Avenue Realty Trust*, 968 F.2d 1332, 1360–61 (1st Cir.1992) *See* Minutes, Rulings and Judgment, Adversary No. 90–0069, docket Nos. 27, 28 & 29.

property in February, 1991.[12] This failed attempt was followed by requests from the trustee and trustee's counsel for permission to resign.[13]

Prior to the resolution of the summary judgment requests, the case was transferred to the undersigned.[14] A hearing was held on January 5, 1994 on motion of GDB for lift of stay. Although opposed by the GDB, the court granted trustee's request to sell the property granting him sixty (60) days to consummate the sale. See docket Nos. 181 & 182.[15] The property was sold for one hundred and seventy-five thousand, two hundred and forty-six dollars and eighty-four cents ($175,246.84). While this amount was far less than the original value of the property and would not result in full payment of the secured claim, it was found reasonable by the undersigned in view of the deterioration and depreciation of the property. When authorizing the sale, the court further ordered that the proceeds be placed in an interest bearing account pending resolution of Adversary No. 90–0069.[16] See Order, docket No. 190.

## II. DISCUSSION

In this action, the property of the debtor was sold pursuant to 11 U.S.C. § 363(f)(5) which provides in pertinent part: "[t]he trustee may sell property ... free and clear of any interest in such property of an entity other than the estate only if—such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5).

Where the estate has incurred expenses as a direct result of preservation or disposition

of a secured property, reimbursement may be available from the holder of an allowed secured claim pursuant to 11 U.S.C. § 506(c). In re Golden Plan of California, Inc., 829 F.2d 705, 712–13 (9th Cir.1987). Recovery governed by 11 U.S.C. § 506(c) provides that "[t]he trustee may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

Section 506(c) recovery is solely for the benefit of the estate thereby enlarging the pool of assets available at the time of distribution. In re Swann, 149 B.R. 137, 146 (Bankr.D.S.D.1993). See, also, 3 Collier on Bankruptcy ¶ 506.06 (15th ed. 1994). However, general administrative costs, statutory commissions for the trustee, value of labor for the debtor and attorneys' fees of the estate are not available from the holder of the secured claim absent a showing of a resulting benefit to the holder of the secured claim. 3 Collier on Bankruptcy ¶ 506.06 (15th ed. 1994).

In order to prevail on its claim against the holder of the secured claim, the trustee has the burden to establish that the costs and expenses were necessary to the preservation and disposition of the property, that they were reasonable and that they directly benefited the holder of the claim. In re Parque Forestal, Inc., 949 F.2d 504, 512 (1st Cir.1991) & Matter of Saybrook Mfg. Co., Inc., 130 B.R. 1013, 1016 (Bankr.M.D.Ga. 1991). Further, he must establish that the

---

12. See docket Nos. 146, 152 & 153. The trustee asserts that the sale failed because while state law provides that the registrar is not obligated to record the sale of the property absent issuance of a court order authorizing the sale due to the outstanding liens upon the property, the court refused to issue the order for not being required by applicable bankruptcy law. See Order, docket No. 148.

13. These requests were found frivolous and denied. See Order, docket No. 163.

14. In September, 1993 the legal representation for GDB was substituted by Jorge Souss, Esq. and Mildred Caban, Esq. of Goldman, Antonetti, Cordova & Axtmayer. Consequently, due to a

potential conflict of interest, this case, originally assigned to the Hon. Sara De Jesus, was transferred to the undersigned on October 14, 1993. See Order, docket No. 172 & Adversary No. 90–0069, docket No. 24.

15. See also docket Nos. 185, 186, 190, 192, 193 & 197.

16. Furthermore, the court held that the interest generated from the proceeds of the sale held in escrow will be to the benefit of the estate since the property was sold as a result of the trustee's efforts and against the opposition and request for lift of stay by the GDB. See Adversary No. 90–0069, docket No. 27.

recovery claimed is not reflective of the ordinary administrative expenses normally borne by the estate. *See, e.g., Swann,* 149 B.R. at 143 & *In re National Enterprise Wire Co.,* 103 B.R. 56, 60 (Bankr.N.D.N.Y.1989).

■ It is the trustee's burden to show that a benefit to the creditor was directly attributable to his acts as well as quantify that benefit. 3 *Collier on Bankruptcy* ¶ 506.06 (15th ed. 1994). The costs must result in a direct and primary benefit to the creditor; expenses which result in improvement to the position of the debtor but only indirectly benefit the creditor are not recoverable. *Brookfield Production Credit Association v. Borron,* 738 F.2d 951 (8th Cir.1984) & *Swann,* 149 B.R. at 143. Thus, recovery is not permitted where the benefit derived from the actions of the trustee could have been obtained even in the absence of his acts. 3 *Collier on Bankruptcy* ¶ 506.06 (15th ed. 1994).

■ Finally, benefit to the holder of the secured claim is not measured by the relative value of the property or the amount of the secured claim. *Matter of Trim–X, Inc.,* 695 F.2d 296, 298–99 (7th Cir.1982) (the legislative history and the fact that § 506(c), unlike § 506(b), does not contain specific language linking recovery to the receipt of more than the amount of the secured claim).

■ Necessary expenses are those unavoidably incurred by the trustee when acting as the representative and to the benefit of unsecured creditors. *In re Williamson,* 94 B.R. 958, 962–63 (Bankr.S.D.Ohio 1988). Accordingly, expenses are not considered necessary when incurred as a result of the trustee's failure to turn over the collateral or abandon secured property when the estate has no equity in the property. *Matter of Combined Crofts Corp.,* 54 B.R. 294, 297 (Bankr.W.D.Wis.1985).

■ Reasonableness of the costs are generally measured against the costs and expenses that may have been required in the event that the creditor foreclosed on the property including fees and broker commissions and expenses for repairs, resolution of disputes or any other actions required to prepare the property for sale. 3 *Collier on Bankruptcy* ¶ 506.06 (15th ed. 1994). Where the creditor has not consented to the sale, his contribution to the estate for costs and expenses incurred thereby is usually but not necessarily limited to and measured by the actual cost in state court of foreclosing the lien. *Saybrook,* 130 B.R. at 1018 *citing In re Anderson,* 66 B.R. 97, 99 (9th Cir. BAP 1986).

■ Alternatively, recovery of expenses from the holder of a secured claim may also be available from the proceeds of the sale of secured property where the holder of the claim **caused** or **consented** to the expenditure. Consonant with that principles of equity, a lienholder must bear the expenses of bankruptcy administration which are solely for his benefit, are incurred with his consent or caused by him. *In re Louisville Storage Co.,* 21 F.Supp. 897 (Bankr.W.D.Ky.1936) *aff'd, Louisville Title Mortgage Co. v. Louisville Storage Co.,* 93 F.2d 1008 (6th Cir.1938) & *In re Hotel Associates, Inc.,* 6 B.R. 108, 112 (Bankr.E.D.Pa.1980). *See, also, Trim–X,* 695 F.2d at 301 (costs to preserve the secured property accrued after the trustee filed the petition to abandon but where the secured creditor failed to promptly respond to the petition, these expenses were properly charged to the secured creditor as these were caused by his delay).

## A. COSTS

The court finds that recovery for the costs incurred by the estate in selling the real property is justified in two ways. First, the facts show that the sale directly benefited GDB and that the costs were necessary and reasonable. Second, the facts support the finding that the obstinate acts of GDB directly caused the costs of the sale to be incurred by the estate.

■ The sale of the property directly benefited GDB in that the lien attached to the proceeds. In addition, it is clear from the facts that expedition of the sale could only result in a greater yield to the creditor as the value of the property decreased proportionately with the length of time it remained vacant and unattended.

■ The costs of the sale were necessary. Even though the sale did not produce equity for the estate or result in full payment of the secured claim, there is no doubt that behavior of GDB effectively placed the trustee in a position where the only option was to sell the property. By maintaining the position that it would only agree to the abandonment of the property while not presenting any evidence to substantiate the demand, the trustee had absolutely no other choice than to pursue the single avenue available for the disposition of the debt.

■ Finally, the costs were reasonable. Given the specific facts of the case, these costs are fully reimbursable whether or not the GDB may have been forced to incur the same expenses as a result of its own efforts to sell the property. As the GDB effectively eradicated any choice the trustee may have in whether to sell the property, it is only proper that it now bear the costs directly resulting from its behavior. However, as discussed below, we deem it necessary to reduce particular amounts requested in order to meet statutory mandates.

■ The facts also support the finding that defendant's conduct caused the expenses to be incurred. GBD's conduct has undoubtedly delayed disposition of the debtor's property to the detriment of its own claim as well as that of the unsecured creditors. Even though the GDB's claim was oversecured by the real property, it chose to pursue a course whereby the value of the property inevitably and unnecessarily decreased over an extended period of time by choosing to excessively and stubbornly pursue the inventory discrepancy even though the resolution of such would not affect their claim in the least. As revealed by their acts, this positioning precluded any hopes of resolution through negotiation.[17]

In addition, defendant took the inflexible stance that the property should be abandoned without presenting any evidence to support the action. When negotiation was attempted by the current trustee, GDB was extremely slow in responding. Finally, the meeting took place but GDB sent representatives not authorized to act. Subsequently, defendant never contacted the trustee to inform him of its final decision but, instead, filed a motion to expedite a hearing on its motion to compel abandonment filed almost an entire year before. Furthermore, GDB continued to pursue this demand without completing an appraisal of the property.[18] GDB's continued pursuit of the inventory discrepancy and its insistence on abandonment without supporting the demand coupled with the perpetuation of an uncompromising posture is undoubtedly the cause of the loss of equity and the unfortunate ending to this saga. Whether these acts were indicative of malice or bureaucratic red tape is unclear. However, it is crystal clear that such tactics are destructive to the debtor, the unsecured creditors and the merits of any bankruptcy proceeding.

After an extended period of almost six years attempting to dispose of the debt, it can only be imagined that the trustee would do whatever it would take to resolve the matter to avoid further deterioration of the property. Even the brief review of GDB's acts given here leads to the undeniable conclusion that the GDB itself caused the sale of the estate and, therefore, the costs incurred by the estate.[19]

■ Addressing the specific costs, the GDB objects to charges for the certified copy, registration vouchers and title search alleging that these expenses should be born by the purchaser. The law provides that

17. The court is not convinced by GDB's assertion that the decrease in the value of the property due to the delayed sale could not be attributable to its conduct because the only disagreement with the trustee concerned the inventory. Such a myopic view is not substantiated in light of the unsupported demand for abandonment and the apparent refusal to work toward a real resolution.

18. It wasn't until June, 1990 that GDB had debtor's property appraised even though by that time it had maintained its position for abandonment for eighteen months. The court does not find that the appraisals conducted prior to the bankruptcy petition justify the GDB's delay inasmuch as vacancy and vandalism resulted in the ongoing depreciation of the property.

19. Given the effects of this behavior, the allocation of the costs for the sale of the property is minimal.

"[t]he expense of the execution of the instrument shall be for the account of the vendor, and those of the first copy and those subsequent to the sale shall be charged to the vendee, unless there is an agreement to the contrary." 31 L.P.R.A. § 3751.

GDB's conclusion is not legally sustainable. Simply, the law provides that the obligations generally belong to the purchaser. Accordingly, different arrangements agreed upon by the parties are also sanctioned. Finding that the sale of the property and the subsequent costs incurred by the estate were the direct result of GDB's behavior, we reject GDB's belated attempts to control the terms of the sale after-the-fact. GDB was given ample opportunity to substantiate its position that the property should be abandoned but failed to do so resulting in the trustee's sale of the property after a long delay, so caused by GDB, in an effort to stop the decline in value.

■■ In addition, GDB asserts that the amount charged for the internal revenue stamps are in excess of those applicable to a one hundred and seventy-five thousand, two hundred and forty-six dollars and eighty-four cents ($175,246.84) sale. These charges are regulated by 4 L.P.R.A. § 851(e) which provides that "[w]hen the consideration involved exceeds $5,000, two dollars for the first $1,000, and an additional dollar for each thousand dollars or fraction thereof, for the original; and one dollar for the first $1,000 and an additional fifty cents for each thousand dollars or fraction thereof, for each copy." 4 L.P.R.A. § 851(e). Absent an explanation from the trustee for charges in excess of the statutory amount, the cost for the internal revenue stamps shall be reduced to reflect an amount consonant with the statute.

■■ The GDB also objects to the nine hundred and fifty dollar ($950.00) charge for the registration vouchers for deed and lien cancellation on two grounds. First, the GDB asserts that such charges would be waived in the event that the GDB would have conducted a foreclosure sale. The state law provides, in pertinent part, "[m]ortgage registra-

tions shall be cancelled without request of either party when successive recorded entries on the property reveal that it, or the right on which the mortgage was constituted, was attached or sold at public auction to the creditor or to another person; and also, when it appears from successive entries, that the mortgaged property or right was conveyed, by whatever title, to the creditor, according to the Registry." 30 L.P.R.A. § 2458.

Although it appears that this charge may not be applicable under the scenario proposed by GDB, the court rejects application to this case as the conduct of the objecting party caused this transaction to occur. In effect, GDB waived any control over the terms and conditions of the sale of the property.

Without citing any provision, GDB also asserts that the charge for the registration vouchers should be reduced to six hundred and sixty dollars and fifty cents ($660.50). It appearing that the amount requested by the trustee is supported by a receipt for the exact amount requested, the court finds no reason to challenge the charge and therefore allows the full amount.

■■ The GDB asserts that the amount charged for the notarial fee is inflated and contrary to that allowed under the law. Title 4 L.P.R.A. § 2131(b) provides that "[t]he notary shall earn fees equal to one percent (1%) of their value, for executing notarial documents concerning valuables or where a thing or amount of determinable value is involved whose value exceeds ten thousand dollars ($10,000.00), but does not exceed five hundred thousand dollars ($500,000.00)." 4 L.P.R.A. § 2131(b).

One percent of the sale price yields a notary fee of one thousand, seven-hundred and fifty-two dollars ($1,752.00). Accordingly, the notary fees charged by the attorney in excess of four thousand dollars are hereby reduced to reflect the amount allowed by statute.[20]

---

**20.** We reject GDB's request, made without explanation or support to reduce the notarial fees to

.05% of the purchase price.

Finally, GDB objects to a sixty dollar ($60.00) charge for copies requested from court files. Due to the lack of explanation and/or receipts to substantiate the charge, the court has no other choice than to reject this item.

Accordingly, the following charges incurred as a result of the sale of debtor's property shall be born by GDB and deducted from the proceeds of the sale:

1. Internal revenue stamps for original deed .............. $ 177.00
2. Internal revenue stamps for copy ...................... $ 88.50
3. Registration vouchers ........ $ 950.00
4. Notarial fees ................ $1,752.00
5. Title search ................. $ 15.00
6. Notarial stamp ............. $ 1.00

The grand total due the estate in costs from the proceeds of the sale of the secured property by the trustee is three thousand and eighty-three dollars and fifty cents ($3,083.50).[21]

## B. TRUSTEE COMMISSION

The next issue is whether the trustee is entitled to a commission for the sale of the property. While a broker's commission may be paid from the proceeds of a sale by the holder of the secured claim pursuant to § 506(c), *In re Wine Boutique, Inc.*, 117 B.R. 506, 509 (Bankr.W.D.Mo.1990), this section does not provide for compensation to the trustee. *In re Dinsmore Tire Center, Inc.*, 81 B.R. 136, 138 (Bankr.S.D.Fla.1987) (any negotiation between the secured creditor and the trustee for a surcharge resulting from the disposition or preservation of the property under § 506(c) is for the benefit of the estate, not for payment for services provided by the trustee).

The Code does provide, however, that a trustee may be paid commission for the sale of secured property pursuant to two different avenues. First, a trustee is entitled to statutory commissions to the extent that the unsecured creditors benefited from the sale pursuant to 11 U.S.C. §§ 326 & 330. In addition, the trustee may be entitled to commissions, on the sale of secured property where the secured creditor and the trustee enter into an agreement providing for such payment.[22]

Statutory commissions for a trustee and/or fees for professional services are set forth in 11 U.S.C. § 326. Accordingly, "[i]n a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not is excess of $3,000, and three percent on any amount in excess of $3,000, upon all monies disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims." 11 U.S.C. § 326(a).[23]

Statutory commissions for a trustee are disbursed pursuant to the authority of § 330 which provides, in pertinent part, that "[a]fter a notice to any party in interest and to the United States trustee and a hearing, and subject to section 326 ... of this title, the court may award to a trustee, ... or to the debtor's attorney—reasonable compensation for actual, necessary services rendered by such trustee, ... or attorney, as the case may be, ... based on the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and reimbursement for actu-

---

**21.** Attorney for the trustee submitted a bill for five thousand, eight hundred and twenty-eight dollars and fifty cents ($5,828.50). The costs included in this total are as follows:

1. Internal revenue stamps for original deed — $ 427.00
2. Internal revenue stamps for copy — $ 125.50
3. Registration vouchers — $ 950.00
4. Notarial fees — $4,250.00
5. Title search — $ 15.00
6. Notarial stamp — $ 1.00
7. Copies — $ 60.00

**22.** This is not alleged in this case.

**23.** The Bankruptcy Reform Act of 1994 increases compensation to "25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000 ..." 11 U.S.C. § 326(a).

al, necessary expenses."[24] 11 U.S.C. § 330(a)(1).

Generally, bankruptcy courts have held that a trustee is not entitled to statutory commissions from the sale of fully secured property pursuant to § 326 where the sale proceeds are for the benefit of a secured creditor rather than distributed to the estate for the benefit of the unsecured claims thereby warranting abandonment of the property. *National Enterprise*, 103 B.R. at 59. However, where the trustee exercises good judgment and determines that the estate has an equity interest and chooses to liquidate rather than abandon, he would be entitled to a commission, costs and expenses including attorney's fees from the proceeds which exceed the secured claim. 2 *Collier on Bankruptcy* ¶ 326.01[4][b] (15th ed. 1994).

While the majority holds that commission and costs are contingent upon the exercise of good judgment and the consequential equity, some courts have allowed the trustee's commission and attorney's fees where it became apparent that a mistake in judgment was made subsequent to beginning the transaction. *In re Padgett*, 49 B.R. 212, 215–16 (Bankr.W.D.Ky.1985). However, where it was apparent before the sale that the estate lacked equity in the property and does not satisfy the indebtedness, trustee's commissions and costs are not allowed as there is no actual or constructive disbursement. *In re B & L Enterprises, Inc.*, 26 B.R. 220, 223 (Bankr.W.D.Ky.1982).

The various attempts to sell the property by the trustee subsequent to the termination of the security service led to the inevitable conclusion that the sale of the secured property would not only fail to produce equity for the estate but also not pay the secured claim in full. Although unfortunate for the trustee, statutory commissions are not available even though the sale of the property which would have oversecured the claim at one time but subsequently diminished in value due to the tactics of another party of interest. Accordingly, statutory commissions for the trustee in this case are precluded.

## C. SECURITY SERVICES

The costs of the security services may be recovered from the proceeds of the sale of the real property pursuant to § 506(c). There is no doubt that these costs were generated in an attempt to preserve the secured property which directly benefited GDB by keeping the property intact thereby insuring payment of its claim in full. These efforts were also necessary. Subsequent to the discontinuation of these services, loss of value of both the personal and real property were primarily attributable to vandalism. Furthermore, the court finds that the charges are fully accounted for and found to be reasonable.

Finally, conspicuously absent from the record are objections by GDB to the trustee's request for security services even though notified. While consent may not be inferred lightly but supported by the facts, *In re Flagstaff Foodservice Corp.* 739 F.2d 73, 77 (2d Cir.1984), consent may certainly be implied where the holder of the secured claim who stands to directly benefit from professional services contracted to preserve the secured property is notified of the action and fails to object. In fact, GDB did not voice any objection until the property was about to be sold several years later and after it became apparent that the value of the property had diminished considerably. Even at this late date, GDB has not legally substantiated its objection.

## III. CONCLUSION

Accordingly, it is hereby ORDERED that the trustee Diego Ferrer's request that the costs incurred by the estate for the sale of debtor Iberica Manufacturing, Inc.'s real property located at Calle Munoz Rivera # 49, Juncos, Puerto Rico, be charged against the proceeds of the sale is GRANTED for the amount of three thousand eighty-three dollars and fifty cents ($3,083.50).

---

**24.** The Bankruptcy Reform Act of 1994 has expanded this section to include that the court shall not provide compensation for services that were not "reasonably likely to benefit the debtor's estate; or necessary for the administration of the case." 11 U.S.C. § 330(a)(4)(A)(ii)(I) & (II).

It is further ORDERED that trustee Diego Ferrer's request for commissions on the sale of debtor's Iberica Manufacturing, Inc. real property located at Calle Munoz Rivera #49, Juncos, Puerto Rico, is hereby DENIED.

It is further ORDERED that the trustee is to reimburse the escrow fund wherein the proceeds of the sale are held in accordance with this order, plus interest that would have been earned.[25]

It is further ORDERED that trustee Diego Ferrer's request that the costs incurred by the estate for security services provided to debtor Iberica Manufacturing, Inc.'s real property located at Calle Munoz Rivera #49, Juncos, Puerto Rico, during the period of February 4, 1988 through December 15, 1989 be paid by the Government Development Bank is GRANTED for the amount of forty-two thousand, eight hundred and forty dollars ($42,840); as such, this amount shall be deducted from the proceeds of the sale of debtor's property.

SO ORDERED.

---

**25.** The record does not contain court authority for the trustee to deduct a commission or costs beyond those allowed by the pertinent statutes from the sale proceeds. *See* docket Nos. 184D & 190D.