**In re CALIFORNIA WEBBING IN-DUSTRIES, INC. d/b/a Elizabeth Webbing Mills, Unitex, Debtor.**

No. 00–11116.

United States Bankruptcy Court, D. Rhode Island.

July 5, 2007.

Paul M. Singer, Esq., Reed Smith Shaw & McClay LLP, Pittsburgh, PA, Steven M. Richard, Esq., Nixon Peabody LLP, Providence, RI, for Debtor.

Edward D. Feldstein, Esq., Roberts Carroll Feldstein & Peirce, Providence, RI, Special Counsel to Debtor.

Michaël L. Cook, Esq., Schulte Roth & Zabel LLP, New York, NY, for CIT Group/Commercial Services, Inc.

Diane Finkle, Esq., Winograd Shine & Zacks, Providence, RI, for KB Mezzanine Fund, II L.P.

Jonathan D. Yellin, Esq., Riemer & Braunstein, Boston, MA, Richard S. Mittleman, Esq., Cameron & Mittleman, Providence, RI, for Creditors' Committee.

Andrew S. Richardson, Esq., Boyajian Harrington & Richardson, Providence, RI, for Verdolino & Lowey, P.C.

## DECISION DETERMINING NO CARVE OUT, AND ORDER DENYING FEE APPLICATIONS AS MOOT

ARTHUR N. VOTOLATO, Bankruptcy Judge.

This dispute illustrates the hazards to Chapter 11 professionals who are blindsided when a reorganization case that, by all accounts, appears destined for success, unexpectedly becomes an administratively insolvent Chapter 7 case. The high expectations that once prevailed here faded rapidly when a proposed sale of the then Chapter 11 Debtor's assets didn't happen, leaving the professionals unpaid and arguing with the secured creditor, CIT Group/Commercial Services, Inc. ("CIT"), over whether a carve out from CIT's collateral had been established before the reorganization collapsed. The Chapter 11 professionals,[1] looking to CIT's collateral for payment of their services, argue that a $600,000 carve out was ordered by the Court during a July 11, 2000 cash collateral hearing. After a careful review of the record, and for the reasons discussed below, I find as a fact and conclude as a matter of law that a carve out was not

---

1. They include: Riemer & Braunstein LLP ("Riemer") and Cameron & Mittleman LLP, counsel for the Committee; Deloitte & Touche LLP ("Deloitte"), accountants and financial advisors to the Committee; Roberts, Carroll, Feldstein & Pierce Inc., special counsel for the Debtor; Reed Smith Shaw & McClay LLP ("Reed Smith"), counsel for the Debtor; Nixon Peabody LP ("Nixon"), local counsel for the Debtor; and Verdolino & Lowey, P.C., accountants for the Debtor.

created, either by Court order or with the consent of the secured creditor, CIT.

## TRAVEL

On March 30, 2000, California Webbing Industries, Inc., d/b/a Elizabeth Webbing Mills, Unitex, ("EWEB") filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq* ("the Code"). Post petition, EWEB, as debtor-in-possession ("DIP"), continued operating two related textile businesses, but under separate divisions, i.e., EWEB manufactured webbing products, and its distribution division, Unitex, marketed and sold the product nationwide. The case was being financed by CIT which had a perfected first-priority security interest in all of the DIP's assets, and was owed $21.5 Million at the commencement of the case.

As part of its reorganization strategy the DIP sold the Unitex division for $4.5 Million, and reduced its secured debt to CIT to about $17 Million. Soon, however, the proceeds from the Unitex sale were exhausted, and realizing that the reorganization was not progressing as planned, the DIP began to look for a buyer for its remaining assets. In time, the DIP entered into an asset purchase agreement with a Philadelphia bank, Dimeling, Shreiber & Park, for the sale of a substantial portion of the EWEB assets, at a price sufficient to pay CIT and all administrative claims in full. With the sale pending and some of EWEB's assets remaining, it was still the consensus that the case would be a success, in that all creditors and administrative claimants would receive 100%. However, for reasons not relevant here, in March 2001, the EWEB sale fell through. With no potential purchasers in sight, and with the abrupt resignation and virtual desertion of the DIP by its entire top management team,[2] including CEO George West and the Debtor's whole board of directors, the reorganization was aborted and the case was converted to Chapter 7.

## BACKGROUND

Early on, while the Chapter 11 case was viable, the DIP had applied for and received approval of several short-term conditional cash collateral orders which permitted the DIP to continue operating. All of those orders required the DIP to pay principal installments, interest, and other charges,[3] and every one provided CIT with a perfected first-priority replacement lien on any post-petition assets.[4] Prior to the entry of the order in dispute, CIT, the DIP, and the Unsecured Creditors' Committee (the Committee) had negotiated and reached agreement as to the specific terms of all previously Court approved cash collateral orders. But when the DIP sought a cash collateral agreement for a longer term than their prior two-week arrangements, the parties did not reach an agreement, and on July 11, 2000, a contested

---

**2.** This mass exodus of the DIP top brass on March 19, 2001, was particularly disillusioning since it occurred only four months after the same individuals had requested more than a quarter of a million dollars in "stay" and "incentive" bonus payments for extraordinary and valuable service. Fortuitously, the Court opted to withhold any bonuses until the results of the anticipated EWEB sale were quantifiable. With the benefit of hindsight, the result hardly warrants bonuses.

**3.** A total of seven cash collateral orders were filed and approved, the last being the order in question.

**4.** See Stipulation & Order Authorizing Debtor to use Cash Collateral of the CIT Group/Commercial Services, Inc., In re California Webbing Indus. Inc., Doc. Nos. 27; 48; 79; 110; 157; 168; 252; 253 (April 5, 2000; April 18, 2000; April 27, 2000; May 9, 2000; May 23, 2000; June 1, 2000; July 7, 2000; July 11, 2000).

hearing was held on the DIP's Motion for Continued Use of Cash Collateral.

When the case was converted to Chapter 7 in 2001, a bar date was set the for Chapter 11 professionals to file final fee applications,[5] with the understanding that they would not be acted upon until the end of the case, when the financial condition of the estate could be seen in real time. The professionals all submitted final fee applications. None of the prior cash collateral orders contained carve out provisions, and the instant carve out issue never came up until August 2003, when Debtor's counsel filed a motion entitled: "Motion and Memorandum of Law to Request Hearing on Administrative Claims of Professionals" ("the Carve Out Motion").

### DISCUSSION

■ While there is no reference in the Bankruptcy Code to "carve outs" for professionals, out of practical necessity, the term is commonly included in cash collateral/DIP financing agreements. *In re Hotel Syracuse, Inc.*, 275 B.R. 679, 682 (Bankr.N.D.N.Y.2002); *In re Nuclear Imaging Systems, Inc.*, 270 B.R. 365, 370 (Bankr.E.D.Pa.2001); *In re White Glove, Inc.*, 1998 WL 731611, *6 (Bankr.E.D.Pa. Oct.14, 1998). A carve out generally refers to "an agreement between a secured lender, on the one hand, and the trustee or debtor-in-possession, on the other, providing that a portion of the secured creditor's collateral may be used to pay administrative expenses." *Richard B. Levin, Almost All You Ever Wanted to Know About Carve Out*, 76 Am. Bankr.L.J. 445 (2002); *In re White Glove, Inc., supra*, 1998 WL 731611, at *6; *see also* 2–552 Collier Bankruptcy Manual, 3rd Ed. Rev. 552.02[4][a]. Once agreement is reached, its terms are included as a line item in the Debtor's budget, which is subject to court approval. *Levin, supra*, at 445. There is no established form for a carve out agreement, and because *carve out* is not a defined term, it can mean different things to different people. Therefore, the evolution of such agreements have come to include items such as: (a) the amount being set aside; (b) how the fund should be applied; and (c) whether the fund's continued availability is dependent on the occurrence or nonoccurrence of a specific event. *Levin, supra*, at 445; *In re White Glove, Inc.*, 1998 WL 731611, at *6; *see e.g., Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assoc.)*, 153 F.3d 61, 65 (2nd Cir.1998) (Bankruptcy Court rejected a carve out because the agreement failed to specify the amount to be set aside, and payment was not conditioned on a specific event or occurrence). The details of such agreements are frequently the result of negotiations between the post-

---

5. In August and September of 2000, the professionals filed interim fee applications which were heard on November 2, 2000. At the hearing, questions were raised about the source of funding for these requests, and the Court allowed fees of 50%, *on account*, with the "understanding that everybody who is getting an application approved ... is making the representation that any possible disgorgement ... [will be] no problem ...." CIT Exhibit B, Transcript of November 2, 2000 hearing, pp. 99–101. It was apparent and recognized by the applicants by that time that an administrative shortfall was possible, and that there were questions whether these payments could be deemed a surcharge of the secured creditor's collateral. *See Id.* The Court specifically ruled that the interim award was without prejudice to revisiting issues of surcharge and disgorgement should the estate end up insolvent. *Id.* at 101. With everyone still believing this case would be a success, i.e., at least for the secured creditor and the professionals, interim fees and expenses were paid by the Debtor out of operating capital (CIT's cash collateral) in the amount of $268,919. *See* Joint Pre–Trial Order, Doc. No. 643, p. 22, Schedule A. The parties agree that the issue of disgorgement is not before the Court today. *See Id.* at p. 14.

petition lender, the unsecured creditor's committee, and approval by the bankruptcy court.[6] *5–89 Collier Bankruptcy Practice Guide 89.03[2][k]*.

The applicants contend that a carve out was expressly ordered by this Court, when during the last few moments of the July 11, 2000, cash collateral hearing, this Court mentioned, among other things, the term "carve out", during an ongoing discussion as to how the professionals were going to be compensated. *See* CIT Ex. A, Tr. of July 11, 2000, Hearing, at 202–209. The applicants argue that the minutes of the hearing entered by a deputy clerk support their position, and also that as a matter of public policy, without such carve out provisions there would be no incentive for professionals to provide essential services in Chapter 11 cases, and that this would hamper reorganization efforts.[7]

In response, CIT argues that a carve out was not created: (1) because the Bankruptcy Code unconditionally protects an unconsenting secured creditor's interest in its collateral, and (2) the only way the collateral may be invaded is by consent or by court order—neither of which happened here. CIT concedes that although in the past it has consented to the DIP's use of cash collateral, it has never agreed, even impliedly, to a carve out. CIT points out that the subject was brought up only as an afterthought, at the end of the July 11, 2000, hearing on the DIP's Motion for Use of Cash Collateral, and that a carve out provision never found its way into the agreed upon Cash Collateral Order.

■ After reviewing the pertinent record and transcript of these proceedings, I agree with and adopt CIT's position. The July 11, 2000, hearing was a contested matter on the DIP's motion for continued use of cash collateral, where the emphasis was on whether and/or for how long the DIP would be authorized to use cash collateral. There was nothing scheduled that day regarding a "carve out," with the first reference to "carve out" being made at the conclusion of the hearing, as the Court was in the middle of rendering a bench decision on the use of cash collateral. The Court began to announce its ruling, saying:

> I don't think that's the real problem in this case, whether the initial burdens have been met to establish the right to the use of cash collateral. The . . . question here or the looming one is how long the order should be for . . . .

(CIT Ex. A, Tr., at 199).

Interspersed within the Court's "conversational" ruling, there was extended argument regarding the duration of the use of cash collateral, during which the Court repeatedly offered the parties the opportunity to meet and to try to reach agreement as to all disputed issues, (*id.* at 200–201), but they were unable to do so, and in the absence of a proposed consent order, I ruled as follows:

> I'm not going to pick a hard number. But I'm going to find that there is sufficient equity for today's purposes. Unless there is something radically wrong with the practicality of this notion— we've heard everything from an order that authorizes the use of cash indefinitely, all the way down to 90 days—and I have no idea what the correct number is—I'm going to make it *until further order of the Court*, but on the other hand for CIT's benefit . . . and the bene-

---

**6.** Of course, the unofficial input of the participating professionals is relevant, since it is they who will furnish essential Chapter 11 services, and who will be the principal beneficiaries of a carve out.

**7.** This last point is, of course, valid, and an undeniable fact of life, but not one which trumps existing law.

fit of the Debtor ... [and] certainly for the benefit of creditors, whether they're [at a Section] 105 status hearing, or ... [at] hearings we call ourselves ... we'll start out with the first one [status hearing] 45 days out.

(*Id.* at 200), (emphasis added).

It was only after that "ruling" that Jonathan Yellin, counsel for the Committee, for the first time, raised the carve out issue, saying:

There's just an issue that hasn't—I apologize. There's an issue that hasn't been fully addressed, although it's in the budgets. Your Honor, the Chapter 11 professionals have been operating without any carve-out or any other protections or any retainers since the beginning of this case.

(*Id.* at 202),

and:

Your Honor, we would like the debtor to have the authority to escrow, in a separate account only to be deducted by order of the Court upon approval of fee applications in the Chapter 11 case, the sum of $600,000 upon the entry of this order.

(*Id.*).

Yellin suggested that since the line-item budget included approximately $1 million for bankruptcy restructuring, it follows that this should include professional fees, and that setting aside $600,000 of the $1 million in the budget was appropriate. *See id.* at 203. The United States Trustee correctly expressed concern over this proposal, noting that issues could arise when a carve out is not specific as to amount, duration, and/or source. (*Id.* at 203–206).

Far from agreeing with Yellin, Michael Cook for CIT responded that the professionals were adequately protected, and that:

The Debtor has $3,000,000 of extra cash. It's budgeted. The only protection that anybody needs here is knowing it's there. We are going to have these regular status conferences. People have to apply for the fees ... I think what we should be concerned about today is getting out a workable cash collateral order consistent with your ruling. And if people still want to beat this, if there's a concern—a real concern, then we'll address it.

(*Id.* at 207).

Yellin then countered: "It doesn't have to be the full 600,000, it could be whatever is in the budget. And if we want to change it later on, we'll change it." *Id.* at 208–09. When it became apparent that these "on-the-record negotiations" were going nowhere, the Court verbalized the now infamous two words:

THE COURT:Okay. Let's do that. That's $600,000.00—whatever you call it, segregated, carved-out—I'm not sure what language satisfies who the most.

MR. SINGER: If we have five minutes, we might be able to reach an agreement on how to put it in a separate account.

MR. YELLIN: If His Honor authorizes you to open a separate escrow account and the U.S. Trustee signs off on it, let's get it done.

MR. SINGER: That's fine.

THE COURT:Well, I assume somebody is going to help me. And if everybody in this room would assist in the drafting of an order .... My main concern here is to give the debtor a chance to operate.... So if you need five, ten minutes, ... we're here.

(*Id.* at 209).

The Court then recessed, expecting the parties to draft and present an order covering: (1) the Court's decision allowing the use of cash collateral; (2) setting a 45 day

status conference; and (3) the parties' agreement regarding a carve out or segregation of funds. When the hearing was reconvened the parties reported that they did not have an agreement, but stated that they hoped they could present a consent order within a few days. That was the last this Court heard about "carve out" until three years later, when the instant Carve Out Motion was filed.

According to the parties, subsequent to the July 11, 2000, cash collateral hearing, many versions of proposed orders were circulated, and while the early drafts did contain "carve out" language, the one finally submitted and approved by the Court on July 21, 2000, had no such provision. In fact, and quite to the contrary, the order expressly provides: "Nothing contained herein or in the Budget shall be deemed an admission by CIT ... that any creditor or creditors committee is entitled to surcharge or use in any way the Cash Collateral, the Pre–Petition Collateral or the Post–Petition Collateral."[8] *See* Order, Doc. No. 261, p. 3 (July 24, 2000). All parties reviewed or had an opportunity to review the order prior to its submission, the order presented to the Court was the result of negotiations between the parties, and all agreed to its final form. See Joint Pre–Trial Order, Doc. No. 643, Agreed Facts, ¶ 16. There were no requests for clarification and there was no appeal of the order in question.

■ A carve out may not exist unless ordered, or approved by the Court with the consent of the affected secured creditor. *See In re White Glove, Inc.*, 1998 WL 731611, at *6 (essential to a carve out is "the *agreement* between the secured party and the beneficiary of the carve out"); *In re Blackwood Assoc.*, 153 F.3d at 68 ("a

secured creditor's collateral may only be diminished to the extent that the secured creditor waives its right to the protections afforded by the Code"); *see also In re Trim–X Inc.*, 695 F.2d 296, 301 (7th Cir. 1982) (the estate, and not the secured creditor, bears the cost of the administrative expenses of the estate).

A review of the transcript and the evidence covering what transpired at and subsequent to the July 11, 2000, hearing shows clearly that there was neither a Court order nor CIT's agreement to a carve out. Further, this issue was raised about as late as it can get—after the hearing on cash collateral was concluded, after final arguments, and while the Court was in the middle of its ruling on the use of cash collateral. There was no indication or notice that a carve out request was even informally on the agenda that day, evidenced by Mr. Yellin's initial comment apologizing for raising the question when he did. Notwithstanding its tardiness, once the carve out issue was raised, the parties voluntarily engaged in discussions both in Court and in private, and the Court invited and encouraged the parties to confer privately to try and resolve, *inter alia*, the carve out issue as part of the cash collateral order. The parties attempted to come to a consensus and, by their own admission, failed, as the Order ultimately presented, and the one approved by the Court, contained no carve out provision.

■ The applicants argue that the Court's docket for the July 11, 2000, hearing reflects that a carve out was ordered, but the facts and the record belie that contention. The Court's docket for that day states in part: "$600,000.00 will be put in a separate account for Chapter 11 pro-

---

8. A clearer statement of the secured creditor's intention would be hard to find, and for this Court to conclude, on this record, that CIT

consented to a carve out would last about as long on appeal as it would take the reviewing court to write—REVERSED.

fessionals." *Entry between Doc. 254 and Doc. 253.* Although they may be helpful internal administrative aids, minute entries cannot and do not carry the force of judicial orders, precisely because of the lack of oversight or control over their being lifted out of context and misused, *see U.S. v. Hark,* 320 U.S. 531, 534–35, 64 S.Ct. 359, 88 L.Ed. 290 (1944) ("a formal judgment . . . signed by the judge . . . is prima facie the decision or judgment rather than a statement in an opinion or docket entry"); *Bowles v. Rice,* 152 F.2d 543, 544 (6th Cir.1946) (applying the same rule in civil cases), i.e., here to get the true picture of what transpired that day, a broad review of the July 11, 2000, transcript is required, as opposed to a myopic reference to the eleven words entered by the docket clerk, and to which the applicants pin their argument.

■ Nevertheless, the applicants press on, arguing that post July 11, 2000, CIT agreed, in two letters to the DIP, to a carve out, and that CIT's conduct prevents it from now denying the existence of a carve out, presumably under the doctrines of estoppel and latches. The letters refer to CIT's request(s) to the DIP to set aside a $600,000 "reserve" for the professionals' compensation in its budget. *See* Professional's Exhibits 17 & 18. Additionally, the applicants maintain that CIT recognized a carve out in its September 2, 2003, response to the request for fees, by referring to a $400,000 reserve that was to be set aside for that purpose. Finally, the applicants point to the December 14, 2000, hearing on CIT's motion for relief from stay, where Frank Grimaldi, CIT's Vice President of National Credit Administration, testified that he thought the Court had approved a carve out during the July 11, 2000, cash collateral hearing. *See* Ex. 24 Tr. of December 14, 2000, Hearing, at 85. On cross examination Grimaldi conceded that his carve out recollection was based on the Court's minute entry on the July 11, 2000, docket.

Some of the Debtor's letters do mention a $600,000 "reserve for professional fees" as well, see CIT Ex. K, September 12, 2000 Letter, at 2; CIT's Ex. K, September 13, 2000 Letter, at 2,; CIT Ex. L, October 13, 2000 Letter, at 2. But again, looking at the situation in its entirety, rather than in snippets, the final response sent by CIT to the Debtor's request for information on the "$600,000 Professional Fee Reserve", says: "Mr. Ziegler said that he is working on this with your lawyer and *not to reserve for the $600,000,* and that he would get back to us on this subject, and that he would tell us what to do." *See* CIT's Ex. L, October 13, 2000, at 2 (emphasis added).

■ Under no stretch of the imagination can either of the letters exchanged, or Mr. Grimaldi's testimony at the relief from stay hearing, be construed as consent by CIT, and "without express consent, consent will not be easily inferred." *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 77 (court rejected the professionals' argument that the secured creditor impliedly consented to "bearing the costs of their professional services by employing the chapter 11 procedure to effect the disposition of its collateral"); *In re Blackwood Assoc., supra,* 153 F.3d at 68; *see also In re Iberica Mfg. Inc.,* 180 B.R. 707 (Bankr.D.P.R.1995); *In re S & S Indus., Inc.,* 30 B.R. 395, 398 (Bankr.E.D.Mich. 1983). And as pointed out by the court in *Evanston Beauty Supply, Inc.,* "implied consent is rare in the absence of express consent because a secured creditor's cooperation in reorganization or sales efforts is not the equivalent of consent to finance the costs of a reorganization case." 136 B.R. 171, 177 (Bankr.N.D.Ill.1992).

Additionally, reviewing the transcript of the November 2, 2000, hearing on the professionals' interim fee application, it is abundantly clear that no carve out existed for payment of professionals, and this was almost 4 months *after* the July 11th hearing, and after the letters discussed above were exchanged. Much of that hearing was spent discussing how any fees could be paid by the Debtor because of the very serious question whether the Debtor had *any* unencumbered funds from which to make such payments. During the hearing, comments were made by Jonathan Yellin regarding the July hearing and the cash collateral order that subsequently entered. Yellin stated: "We're not seeking a surcharge, Your Honor. What we're seeking is to allow the debtor to use the cash collateral that this Court authorized in accordance with the budget.... We're seeking merely to come within the confines of this Court's order to allow the use of a budgeted item." CIT Exhibit B, Transcript of the November 2, 2000 hearing, p. 80. Yellin also acknowledged that the July 11, 2000, cash collateral order contains language that "we can't surcharge." *Id.* at 81. Finally, when faced with the question: What happens if the payment of the professional fees turns out to be a surcharge, Yellin answers: "take the money and we'll fight about it later.... If we fail [in the reorganization], then I think we're subject to disgorgement in any event for an administratively insolvent case." *Id.* at 82–83.

At the end of the hearing and with great reservation, the Court ordered a reduced *on account* payment of fees with a clear warning to the professionals that the *on account allowance* was subject to disgorgement in the event of an administrative insolvency. *See* Discussion in Footnote 5, *supra.* The ruling was specifically without prejudice to the secured creditor's right to later argue that this award amounted to an unauthorized surcharge of their collateral and should be disgorged. *Id.* If a carve out existed in November 2000, it would have been simple and prudent for the professionals and the secured lender to say so and put the issue to rest early on, when the reorganization was still in prospect. On that point, I find that the parties did not formalize a carve out agreement in November 2000, because there was no consent to a carve out.

In support of their legal argument the applicants cite the following cases: *In re Nuclear Imaging,* 270 B.R. at 379; *Official, Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.),* 984 F.2d 1305 (1st Cir.1993); and *In re Evanston Beauty Supply, Inc.,* 136 B.R. at 177. These cases, they say, stand generally for the proposition that courts routinely allow payment of fees from a secured creditor's collateral when the secured creditor has expressly or impliedly consented to allowing compensation to be paid out of its collateral. I find these cases factually distinguishable, legally inapposite, and of no value in resolving the issue at bench. For example, in *Evanston Beauty Supply, supra,* 136 B.R. at 177, the court specifically found that a secured creditor, by failing to object to a fee application, did *not* impliedly consent to the professional's being paid from its collateral. *See also In re New England Carpet Co.,* 28 B.R. 766 (Bankr.D.Vt.1983) (a secured party's failure to seek relief from stay or to seek adequate protection does not constitute consent, implied or otherwise, to payment of reasonable expenses of administration). Additionally, while the court in *Nuclear Imaging* did find that a carve out existed, the cash collateral order, to which the secured creditor party consented, specifically included "carve out" and the order specified how the set aside funds should be applied. 136 B.R. at 177 (*see* fn. 2, agree-

ment states in part: "# 4. *Carveout.* NPF X consents to a carve out under 11 U.S.C. § 506 in the amount of $125,000 from the Accounts for the benefit of CMK"). In the instant case, CIT specifically withheld its consent to a carve out. Finally, in *SPM Mfg. Corp.*, the court addressed the validity of an agreement between the oversecured creditor and the unsecured creditor's committee, whereby the oversecured creditor *voluntarily agreed* to pay the committee's expenses, after the case converted to Chapter 7. 984 F.2d 1305, 1313 (1st Cir.1993) (emphasis added). The debtor objected on the ground that the agreement violated the priority provisions of the Bankruptcy Code. *Id.* The First Circuit held that the Bankruptcy Code does not prohibit such agreements, i.e., where a secured creditor voluntarily agrees to pay professionals (or others) out of its collateral. *Id.* While this Court acknowledges that the cases cited by the applicants are all well reasoned and correctly decided, none are relevant or have any factual application here. So that while there has been much discussion about carve out, the totality of circumstances make it clear that no carve out agreement was ever reached.

Based upon the entire record and the applicable law, I find that CIT's conduct does not translate to consent, express or otherwise, to the creation of a carve out from its collateral for the payment of professionals. *See In re Flagstaff Foodservice Corp., supra,* 739 F.2d at 77; *see also In re Chicago Lutheran Hosp. Ass'n,* 89 B.R. 719 (Bankr.N.D.Ill.1988); *In re S & S Indus., Inc.,* 30 B.R. at 398 (court observed that construing mere cooperation as the basis for ordering payment of administration expenses out of secured property would "make it difficult, if not impossible, to induce new lenders to finance Chapter 11 operation"). Similarly, here, to adopt the argument that CIT impliedly

consented to a carve out on these facts would chill future secured creditors' willingness to participate in the reorganization process. *In re Flagstaff Foodservice Corp.,* 739 F.2d at 77 ("saddling unconsenting secured creditors with professional fees ... would discourage those creditors from supporting debtor's reorganization efforts").

### CONCLUSION

For all of the reasons discussed, the Debtor's Carve Out Motion is DENIED. Because there are no funds in the estate from which to pay the professionals, their applications (Doc. Nos 454, 456, 459, 462, 465, 592, and 600) are DENIED as MOOT.

Enter judgment consistent with this opinion.